[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 10, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-11985
_____

D.C. Docket No. 01-01344 CV-CC-1

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

versus

RICHARD P. SMYTH,
MICHAEL J. BECKER et al.,

Defendants,

ARNOLD E. JOHNS, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
Northern District of Georgia

_____

**(August 10, 2005)**

Before EDMONDSON, Chief Judge, and TJOFLAT and KRAVITCH, Circuit
Judges.

TJOFLAT, Circuit Judge:

In this case, the Securities and Exchange Commission obtained a judgment against Arnold E. Johns, Jr., for $743,217.02, which represented the profits he reaped from insider trading in the shares of Vista 2000, Inc. Johns appeals the judgment, contending that the procedure the district court employed in determining the profits he should disgorge denied him due process. We agree and therefore vacate the judgment and remand the case for further proceedings.

I.

Johns was president and a director of Vista 2000, Inc. (Vista), a Delaware corporation based in Roswell, Georgia, from February 1995 to the summer of 1996.[1] Vista designed and sold a variety of consumer safety products, including trigger guards for firearms and radon and carbon monoxide detectors for homes. When Johns joined the company, Vista was a public company, having completed an initial public offering in October 1994. Johns answered to Richard Smyth, Vista's CEO and the officer primarily responsible for the company's day-to-day operations.

Johns signed on with a starting annual salary of $125,000, and he received options to purchase Vista stock—up to 200,000 shares—at an exercise price of

_____

[1] Johns resigned as president in June and as a director in July.

$1.28 per share. As president, Johns acquired a wealth of material and adverse inside information about the company, and he ultimately exercised some of his options and sold the resulting shares of stock before any of this information became public.

Almost immediately after coming to Vista, Johns was called upon to perform functions in the role of "Chief Financial Officer." Specifically, Smyth charged him with signing and filing the quarterly Form 10-Q for the period ending March 31, 1995.[2] Although Vista hired Michael Becker in June 1995 to take over its financial reporting duties, Johns also signed and filed the 10-Q for the period ending June 30, 1995. Both quarterly forms had been prepared by other employees at Vista and contained materially incorrect information due to the method used to calculate quarterly earnings and shares outstanding. Johns felt that the content of the June 30 10-Q was misleading and expressed his concern to Smyth, telling him that he would not sign the document. Smyth instructed him to sign it, and Johns relented, and he signed and filed the 10-Q.

In May and August 1995, Vista issued press releases indicating that it had acquired Alabaster, Inc. The May release stated that the product lines of the two

---

[2] Publicly traded corporations must file the Form 10-Q quarterly as required by the Securities Exchange Act of 1934, 15 U.S.C. § 78m, 17 C.F.R. § 240.13a-13. In the form, the corporation must make certain financial statements and disclosures regarding its activities.

companies had already been integrated; the August release gave an effective acquisition date of June 30. Both of these statements were false. Johns confronted Smyth, insisting that the press releases were inaccurate, but the misstatements stood uncorrected.

In December 1995, Steven Cunningham, Vista's outside counsel, advised Becker that the company's 10-Qs would have to be restated because of the improper method Vista had employed in computing earnings per share. Becker went to Smyth, and Smyth disregarded Cunningham's advice. The 10-Qs were not amended. Later that month, Johns contacted Cunningham to discuss the possibility of exercising his options. On December 21, 1995, Johns exercised some of his options in a cashless exercise. Around the same time, Vista's new controller, Mary Beth Warwick, told Johns that the company's books were not in order.

On February 7, 1996, Cunningham sent a letter to Johns and Smyth reiterating his concerns about the company's 10-Qs for the periods ending March 31, June 30, and September 30, 1995, and instructing them to tell the officers and directors not to sell any Vista securities until the misstatements in the 10-Qs had been cured. Two days later, Johns exercised additional options; he sold stock the exercises had yielded at various times over the remaining days of the month.

4

Altogether, the sales yielded nearly $550,000. At Johns's selling points, Vista's stock was trading at prices ranging from $10.56 to $12.50 a share.

On March 22, 1996, Cunningham resigned as Vista's counsel, citing the company's continued refusal to follow his advice on the conduct of its affairs. On March 26, 1996, Vista issued a press release indicating that it would be amending its 10-Qs and other filings to reflect a net loss of $5,000,000 for 1995.[3] On March 26, Vista's stock was trading at $12.875 a share. The next day, on a volume nearly five times that of March 26, the stock declined twenty-two percent in value to close at $10.062 a share.

On April 15, 1996, Vista issued another press release stating that Smyth had resigned and that its audit committee had found "material accounting and financial improprieties that the Company will have to remedy through the issuance of restated financials for several historical periods." The stock, which had been in a steady decline since the March 26 press release, declined further, sliding to $2.50 a share by April 18.

At some point during 1996, the Securities and Exchange Commission (SEC) launched an investigation into Vista's financial affairs. Its investigation

---

[3] Although Vista had not yet completed its final filings for 1995, the 10-Qs it had filed that year routinely reflected net income when in fact the company was losing money, as the $5,000,000 loss indicated.

culminated in this lawsuit, which the SEC brought against Johns, Smyth, and two other Vista officers on May 25, 2001.[4]

## II.

In its complaint, the SEC alleged that Johns violated various provisions of the Securities Act and the Securities Exchange Act, and rules promulgated thereunder, and engaged in insider trading while an officer at Vista.[5]  As remedies, the SEC sought a permanent injunction barring Johns from further violation of the

---

[4] The SEC filed a "First Amended Complaint for Injunctive and Other Relief" on June 20, 2001, and it is that complaint on which the case proceeded to judgment.  We therefore refer to the amended complaint as "the complaint."

[5] The complaint contains nine counts, six against Johns.  Count I alleges violations of section 17(a) of the Securities Act (15 U.S.C. § 77q(a)) by Johns and others; Count II alleges violations of section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by Johns and others; Count III alleges liability as a control person for Vista's violations of section 13(a) of the Securities Exchange Act (15 U.S.C. § 78m(a)) and Rules 12b-20 and 13a-1 (17 C.F.R. §§ 240.12b-20 and 240.13a-1) for Smyth only; Count IV alleges liability as control persons for Vista's violations of section 13(a) of the Securities Exchange Act and Rules 12b-20 and 13a-11 (17 C.F.R. § 240.13a-11) for Johns and Smyth; Count V alleges liability as control persons for Vista's violations of section 13(a) of the Securities Exchange Act and Rules 12b-20 and 13a-13 (17 § C.F.R. 240.13a-13) for Johns and Smyth; Count VI alleges liability as control persons for Vista's violations of sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act (15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)) for Johns and Smyth; Count VII alleges violations of section 13(b)(5) of the Securities Exchange Act (15 U.S.C. § 78m(b)(5)) and Rules 13b2-1 and 13b2-2 (17 C.F.R. §§ 240.13b2-1 and 240.13b2-2) by Johns and others; Count VIII alleges violations of section 14(e) of the Securities Exchange Act (15 U.S.C. § 78n(e)) and Rule 14e-3 (17 C.F.R. § 240.14e-3) by Alan T. Davis, a co-defendant who had provided accounting services to Vista; and Count IX alleges violations of sections 16(a) and 16(c) of the Securities Exchange Act (15 U.S.C. §§ 78p(a) and 78p(c)) and Rules 16a-2 and 16a-3 (17 C.F.R. §§ 240.16a-2 and 240.16a-3) by Smyth.  Each count incorporates the first 457 paragraphs of the complaint, which together contain its factual allegations.

securities laws and the disgorgement of his insider-trading profits. Johns, in his answer, denied liability and asserted several affirmative defenses, none of which is relevant here.[6] Following some discovery, Johns and the SEC entered into a stipulation under which Johns withdrew his answer to the extent that it denied liability and consented to the issuance of a permanent injunction. The stipulation reserved for further proceedings the amount of the profits Johns would disgorge; that is, Johns reserved the right to litigate the amount of the disgorgement and prejudgment interest.[7] The parties attached to the stipulation the "Order of Permanent Injunction" they would present to the district court.

On October 30, 2002, the district court entered the Order of Permanent Injunction (hereafter "consent decree" or "decree"). The consent decree contains sweeping injunctive provisions, each of which enjoins Johns, "his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of this Order of Permanent Injunction" from

---

[6] Prior to answering the complaint, Johns moved the court to dismiss the complaint, and each count lodged against him, for failure to state a claim for relief, and alternatively to strike portions of the complaint on the ground that they were redundant and immaterial. See Fed. R. Civ. P. 12(b)(6) and (f). The court denied both motions. Johns's brief challenges these rulings. We do not address them because, as we point out in the text, Johns entered into a stipulation with the SEC and consented to the entry of a decree that disposed of the issues of liability.

[7] Specifically, the stipulation and the subsequent consent decree indicated that "the allegations of the Commission's complaint, except any allegations that the amount of losses avoided is $421,563 as alleged by the Commission in paragraphs 406 and 421 of the First Amended Complaint, shall be deemed true."

disobeying one or more of the securities laws cited in the SEC's complaint.[8]

Regarding the SEC's claim for disgorgement and prejudgment interest, the decree replicates the stipulation by providing that the claim would "be resolved upon motion of the [SEC] Commissioner at a later date."[9]

On July 21, 2003, the SEC moved the district court to determine the amount of disgorgement and prejudgment interest and to "enter final judgment" against Johns. The motion asserted that the SEC was entitled to disgorgement in the sum of $421,563. The SEC arrived at this amount by calculating the losses Johns

---

[8] The consent decree permanently enjoined Johns and the others from "violating, directly or indirectly," the statutes and regulations cited in the SEC's complaint, see supra note 5. Paragraph I of the injunctive portions of the decree is illustrative. It states, in full:

> **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that defendant Johns . . . be and hereby [is] permanently enjoined and restrained from violating, directly or indirectly, Section 17(a) of the Securities Act of 1933 . . ., [15 U.S.C. 77q(a),] by, through the use of any means or instruments of transportation or communication in interstate commerce or the use of the mails:
> 1. employing any device, scheme or artifice to defraud;
> 2. obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
> 3. engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser,
> in the offer or sale of any security.

[9] Although it is styled Order of Permanent Injunction, the consent decree is a partial final judgment because the SEC's claim for disgorgement remained to be litigated. The district court entered a final judgment, which is now before us, after determining the amount of the disgorgement due from Johns.

avoided, using the April 18, 1996 value of the stock—$2.50 a share—as the baseline, and reasoning that by that date the market had absorbed the negative information announced by Vista on April 15.[10] Using this disgorgement amount, the SEC claimed that $321,564.02 in prejudgment interest was also due.

Johns opposed the SEC's motion. Treating it as a motion for summary judgment, Johns argued that the motion should be denied since material issues of fact concerning the appropriate disgorgement figure remained to be litigated. Although he had admitted facts sufficient to make out a case for disgorgement, he had not stipulated to any specific amount due, and thus "the calculation of the amount of 'losses avoided,' if any, [we]re in material dispute." Johns concluded his opposition to the SEC's motion by stating that "the Court must consider the unrelated events, not even addressed by the SEC, that led to the sharp decline in Vista's stock price of approximately 68.7 percent between the time of [his] last transaction in February 1996 and the public announcement of April 15, 1996." According to his formula, Johns avoided losses of only $39,442.81. He also

_____

[10] In withdrawing his answer to the SEC's complaint, Johns was no longer denying that he was aware of the information contained in Vista's April 15 press release at the time he made his trades. The SEC used the formula adopted by Congress in the Insider Trading Sanctions Act of 1984, codified at 15 U.S.C. § 78u-1(f), which defines "losses avoided" as "the difference between the purchase or sale price of the security and the value of that security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information." Johns does not contest the correctness of the SEC's application of the formula.

9

contended that he was entitled to offset any amount owed by $192,000, the cost of the exercise of the 150,000 options at issue in the case. Thus, if his position prevailed, he would owe nothing in avoided losses. Johns formally moved the court to hold an evidentiary hearing to establish the facts essential to his "unrelated events" legal argument. He also informed the court that he was still waiting to depose one of the SEC's key witnesses.

The district court denied Johns's request for an evidentiary hearing on the grounds that he failed to detail the "unrelated events" that led to the decline in the price of Vista shares, and the position he espoused had no support in the law. The legal effect of the court's ruling was that the SEC's submission was unassailable; the SEC need only establish a "reasonable approximation" of losses Johns avoided, and, in the court's view, its submission did that. The court therefore entered judgment against Johns in the sums the SEC requested: $421,563 in disgorgement and $321,564 in prejudgment interest. Johns now appeals. Because Johns withdrew his answer to the complaint's allegations of liability and consented to the entry of a permanent injunction barring him from further disobedience of the securities laws, this appeal presents only one issue: whether the district court should have granted his request for an evidentiary hearing.

III.

In appealing the district court's refusal to hold an evidentiary hearing to resolve the disgorgement issue, Johns is actually challenging the manner in which the district court chose to resolve that issue. We therefore review the court's failure to convene an evidentiary hearing for abuse of discretion. Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1121 (11th Cir. 2004). A district court abuses its discretion when, in reaching a decision, "it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1336 (11th Cir. 2002).

## IV.

Johns contends that the SEC's motion for the entry of a judgment of disgorgement and prejudgment interest was actually a motion for summary judgment, and that the court should have denied it because the amount he should have been required to disgorge was in dispute. The SEC, responding, says that its motion was not a motion for summary judgment, filed pursuant to Fed. R. Civ. P. 56, motion but simply a "motion for judgment." The SEC points us to nothing in the Rules of Civil Procedure, however, that would authorize such a motion. The district court nonetheless accepted the motion as if authorized; in effect, the court minted a new rule. The court did so notwithstanding precedent that holds that

11

district courts may not "promulgate an <u>ad hoc</u> procedural code whenever compliance with the <u>Rules</u> proves inconvenient." <u>Fla. Med. Ass'n v. U.S. Dept. of Health, Educ. & Welfare</u>, 601 F.2d 199, 202 (5th Cir. 1979).[11]

The Rules of Civil Procedure provide guidance for the district court's handling of the SEC's motion for judgment in the form of Rule 55.[12] Rule

---

[11] In <u>Bonner v. Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[12] Rule 55 states in relevant part as follows:

(b) **[Default] Judgment.** Judgment by default may be entered as follows:

(1) **By the Clerk.** When the plaintiff's claim against a defendant is for a sum certain or for a sum which can by computation be made certain, the clerk upon request of the plaintiff and upon affidavit of the amount due shall enter judgment for that amount and costs against the defendant, if the defendant has been defaulted for failure to appear and is not an infant or incompetent person.

(2) **By the Court.** In all other cases the party entitled to a judgment by default shall apply to the court therefor; but no judgment by default shall be entered against an infant or incompetent person unless represented in the action by a general guardian, committee, conservator, or other such representative who has appeared therein. If the party against whom judgment by default is sought has appeared in the action, the party (or, if appearing by representative, the party's representative) shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application. If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute of the United States.

Fed. R. Civ. P. 55.

None of the Rules of Civil Procedure fits hand in glove the situation the district court

55(b)(1) permits entry of judgment by the clerk without any hearing when "the plaintiff's claim against a defendant is for a sum certain or for a sum which can by computation be made certain." In this case, however, the disgorgement and prejudgment interest sums are contested and, as the district court acknowledged, even the SEC's formula for determining those sums represents only "a reasonable approximation of the losses avoided by Johns." In other words, this case involves neither a sum certain nor a sum that could be made certain by computation.

Rule 55(b)(2), which covers "all other cases," requires the district court to hold an evidentiary hearing "to determine the amount" of losses avoided. E.g., Adolph Coors Co. v. Movement Against Racism and the Klan, 777 F.2d 1538, 1543 (11th Cir. 1985) ("[J]udgment of default awarding cash damages could not properly be entered 'without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation.'" (quoting United Artists Corp. v. Freeman, 605 F.2d 854, 857 (5th Cir.1979))); Lowe v. McGraw-Hill Cos., 361 F.3d 335, 339-40 (7th Cir. 2004) ("The Federal Rules of Civil Procedure make a clear distinction between the entry of default and the entry of a default judgment. The default is entered upon the defendant's failure to plead or otherwise defend,

---

faced. The common sense notions of justice that inhere in the Due Process Clause, however, mandated that Johns was entitled to a fair hearing on the fact issues involved in the disgorgement determination. The rule that most closely satisfies this due process concern is Rule 55(b)(2).

13

Fed.R.Civ.P. 55(a), but if an evidentiary hearing or other proceedings are necessary in order to determine what the judgment should provide, such as the amount of damages that the defaulting defendant must pay, those proceedings must be conducted before the judgment is entered. See Rule 55(b)(2).")[13]

Basic notions of due process underpin this requirement. As the Supreme Court noted in Mullane v. Central Hanover Bank & Trust, Co., "'[t]he fundamental requisite of due process of law is the opportunity to be heard.'" 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950) (quoting Grannis v. Ordean, 234 U.S. 385, 394, 34 S. Ct. 779, 783, 58 L. Ed. 1363 (1914)). We believe that the right to be heard is of little value unless the party has some point of reference in established procedural rules to guide his continued participation in the proceedings, particularly when final judgment looms. In this case, Rule

_____

[13] An evidentiary hearing is not a per se requirement; indeed, Rule 55(b)(2) speaks of evidentiary hearings in a permissive tone. See Fed. R. Civ. P. 55(b)(2) ("[T]he court may conduct such hearings . . . ." (emphasis added)). We have held that no such hearing is required where all essential evidence is already of record. See S.E.C. v. First Fin. Group of Tex., Inc., 659 F.2d 660, 669 (5th Cir. 1981) ("Rule 55(b)(2) does not require the district court to hold either an evidentiary hearing or oral argument on a motion for a default judgment.") (citing Thomas v. United States, 531 F.2d 746, 748 (5th Cir. 1976) ("Taxpayer's first contention that the district court should have held an evidentiary hearing and/or oral argument on the motion is without merit. All the essential facts were of record.")). Other circuits agree. See, e.g., KPS & Assocs. v. Designs by FMC, Inc., 318 F.3d 1, 21 (1st Cir. 2003). Other circuits also agree, however, that such hearings are required in all but "limited circumstances," id., as when the district court already has a wealth of evidence from the party requesting the hearing, such that any additional evidence would be truly unnecessary to a fully informed determination of damages. Id. (collecting cases). Those limited circumstances are not present here, where none of the evidence Johns sought to present was before the district court.

55(b)(2) required the evidentiary hearing that the district court did not grant. Thus, the court abused its discretion when it granted the SEC's motion for judgment.

The SEC argues that Johns was not entitled to a hearing because district courts have "discretion not to hear oral testimony on motions" and that Johns waived the right to a trial when he stipulated to the facts in the SEC's complaint for purposes of disgorgement: "Johns consented to a procedure whereby the last remaining issues in the case were to be resolved 'by motion of the Commission.'" The court properly denied the motion for a hearing, the SEC continues, because Johns's motion stated only "in vague terms" what evidence he planned to elicit in the hearing and that he "neither identified the factual issues, the expert witness or the topic, other than 'trading matters,' nor did he specify what the expert would testify." The SEC specifically disavows having sought judgment pursuant to the Rules of Civil Procedure, noting that it moved "in accordance with the stipulation" and that its motion "was governed by the standards applicable to motions generally, where, unlike in a summary judgment context, the district court may, when appropriate, resolve the disputed issues of fact on the papers."

We do not agree with the SEC that Johns agreed to a novel summary proceeding for the determination of disgorgement. The consent decree indicates

15

that Johns shall "pay disgorgement and pre-judgment interest in amounts to be resolved upon motion of the Commission at a later date." This language indicates a couple of things. First, it establishes that the amounts remain "to be resolved"—i.e., that resolution was still necessary at the time the stipulation was entered. Second, it sets the context in which that resolution will take place: "upon motion of the Commission at a later date." We do not read this to mean that the resolution will be exclusively "<u>by</u> motion," but that the resolution will begin—"at a later date"—"<u>upon</u> motion" by the SEC—i.e., at the instance of the SEC. Although we do not find this language ambiguous, any lingering ambiguity is laid to rest by other language in the consent decree, which expressly states that Johns still contests the amount owed to the SEC in disgorgement and prejudgment interest.

The SEC is correct that a hearing is not <u>always</u> required in cases like this one. As we have explained, however, this was not a case where all essential evidence was already of record, and it did not present one of the "limited circumstances" under which the district court could properly exercise its discretion not to hold a hearing. A hearing was required.

V.

The district court erred in granting the SEC's motion for judgment without

16

an evidentiary hearing.  The district court's judgment is accordingly vacated, and

the case is remanded for further proceedings.[14]

---

[14] In this appeal, Johns did not challenge the injunctive provisions contained in the consent decree, which we set out in note 8 supra and accompanying text.  Johns could not challenge them here because he (and the SEC) stipulated that the court could enter a decree incorporating those provisions; moreover, in signing the stipulation, he "waive[d] any right he might have to appeal from the entry of the Order of Permanent Injunction."  Although (for that reason) the consent decree's injunctions are not before us for review, they are still before the district court, which retained jurisdiction to enforce them, and therefore are subject to the court's inherent power to modify or revoke them.  Because the injunctions are still before the district court, we would be remiss if we did not inform the court that they are unenforceable.

The injunctions contained in paragraphs II, III, and IV of the consent decree are identical to the injunction in paragraph I to the extent that they track the provisions of the statute or regulation the violation of which is enjoined.  The paragraphs differ only with respect to the conduct that the statute or regulations explicitly proscribe.  Each of the injunctions is a quintessential "obey-the-law" injunction.  See Florida Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehabilitative Servs., 225 F.3d 1208, 1222-23 (11th Cir. 2000):

> This Circuit has held repeatedly that "obey the law" injunctions are unenforceable.  See, e.g., Burton v. City of Belle Glade, 178 F.3d 1175, 1200 (11th Cir. 1999) (holding that injunction which prohibited municipality from discriminating on the basis of race in its annexation decisions "would do no more than instruct the City to 'obey the law,'" and therefore was invalid); Payne v. Travenol Labs., Inc., 565 F.2d 895, 899 (5th Cir. 1978) (invalidating injunction that prohibited defendant from violating Title VII in its employment decisions).  The specificity requirement of Rule 65(d) is no mere technicality; "[the] command of specificity is a reflection of the seriousness of the consequences which may flow from a violation of an injunctive order."  Payne, 565 F.2d at 897.  An injunction must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law.  See Meyer v. Brown & Root Constr. Co., 661 F.2d 369, 373 (5th Cir. 1981) (citing International Longshoremen's Assoc. v. Philadelphia Marine Trade Assoc., 389 U.S. 64, 76, 88 S. Ct. 201, 208, 19 L. Ed.2d 236 (1967)).

The injunctions reach any violation of the securities laws and regulations Johns may commit.  If the SEC believes that Johns has committed a violation, it has the right to move the district court for an order to show cause why he should not be adjudged in civil contempt and sanctioned.  And it would matter not where the violation occurred, as we now explain.

Paragraph II of the decree enjoins Johns from violating section 10(b) of the Securities

SO ORDERED.

---

Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5. Thus, if Johns violated the statute and the rule by employing a "device, scheme, or artifice to defraud . . . in connection with the purchase or sale" of the shares of Corporation X in California, the district court could make Johns come to Atlanta on a rule to show cause, issued at the SEC's behest, and explain why he should not be jailed, fined or otherwise sanctioned for the violation.

"[T]he Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment. . . ." E.g., SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990). In the above hypothetical, because Johns committed the violations in California and had no presence in Georgia, the district court, and thus the SEC, could not obtain jurisdiction over his person if the SEC sued him in the Northern District of Georgia. By persuading the district court to sign the consent decree it presented pursuant to its stipulation with Johns, the SEC apparently is of the belief that the Due Process Clause would present no hurdle to the enforcement of the injunction it has obtained. Put another way, the Clause would effectively bar the prosecution of an independent suit in Atlanta based on the California violation (because *in personam* jurisdiction over Johns would be lacking), but it would not bar a contempt proceeding in Atlanta based on the same violation. The SEC is also apparently of the belief that the Rules of Civil Procedure would have little application in a contempt proceeding in Atlanta. If the SEC sued Johns in California, Johns would have the benefit of all of the rights the Rules provide a civil litigant, not to mention his Seventh Amendment right to a trial by jury. Not so in a contempt proceeding; the court would issue a show-cause order on the SEC's motion, and would promptly convene a hearing to permit Johns to rebut the SEC's proof that he violated the law. Whether the court would delay the hearing to afford Johns his rights under the Rules, including discovery, and a jury trial of the issues the court would ordinarily submit to a jury were the SEC to sue Johns in a separate action rather than seek enforcement of the injunction are issues a district court should consider in deciding whether to sign an obey-the-law consent decree such as the one the SEC drafted in this case.