**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 11, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

      Plaintiff - Appellee,

v.

MAXXON, INC.; GIFFORD M.
MABIE, JR.,

      Defendants - Appellants,

and

THOMAS R. COUGHLIN, JR.,

      Defendant.

No. 05-5091

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:02-CV-00975-TCK-SAJ)**

---

Ronald C. Kaufman, Kaufman & Associates, PLLC, Tulsa, OK (Jon B. Wallis,
Tulsa, OK, with him on the briefs), for Defendants - Appellants.

Susan S. McDonald, Senior Litigation Counsel (Giovanni P. Prezioso, General
Counsel, Eric Summergrad, Deputy Solicitor, and Susan Straus, Attorney, with
her on the brief), Securities and Exchange Commission, Washington, DC, for
Plaintiff - Appellee.

---

Before **LUCERO**, **EBEL**, and **O'BRIEN**, Circuit Judges.

**EBEL**, Circuit Judge.

Defendants-Appellants Gifford Mabie, Jr. and Maxxon, Inc., the company which Mabie controls, appeal from a jury verdict finding them civilly liable for violating various securities laws and a court judgment imposing various remedies. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.[1]

## BACKGROUND

Mabie founded Maxxon and served, at all relevant times, as its chief executive officer. At the time this lawsuit was filed, he was the company's sole officer and director. Like other small companies with which Mabie was

---

[1] Although this was a complex case involving a ten-day jury trial and separate proceedings on remedies, the record on appeal contains few of the documents and motions filed below and only brief portions of the transcript of the relevant proceedings. Further, many of Maxxon's and Mabie's arguments consist of no more than unsupported statements that error occurred without any citation to pertinent legal authority. We have endeavored to cull the record and interpret the arguments in order to address the issues on the merits wherever possible. However, we remind appellants of their obligation to support their arguments with legal authority, see, e.g., Rios v. Ziglar, 398 F.3d 1201, 1206 n.3 (10th Cir. 2005) ("To make a sufficient argument on appeal, a party must advance a reasoned argument . . . and it must support its argument with legal authority."), and to provide a record sufficient to allow appellate review, see, e.g., 10th Cir. R. 10; Scott v. Hern, 216 F.3d 897, 912 (10th Cir. 2000) ("Where the record is insufficient to permit review we must affirm."), or risk summary dismissal of their claims.

connected, Maxxon never paid him a salary but rather compensated him in shares of stock. Mabie often sold this stock to the public for a substantial profit.

Maxxon was engaged in developing a "safety syringe"—a disposable syringe with a retractable needle. Despite development attempts in conjunction with several different partners, Maxxon never put a marketable syringe into production. Even so, Mabie made numerous statements promoting Maxxon's product. For example, Mabie claimed that Maxxon's syringe could be manufactured for the same price as a standard syringe. Similarly, Mabie stated that the Swedish government was interested in building a facility to manufacture its syringe. However, although a Maxxon representative had met with the Swedish government, no statement of interest was made. Mabie also stated that major companies were interested in purchasing Maxxon; in fact, those companies had made clear that they would not be interested until Maxxon had produced a marketable syringe.

Of particular relevance to this appeal, on October 7, 1998, Maxxon drafted a press release stating that the Patterson Group, a health industry marketing firm, had agreed to help it find a corporate buyer. The release was later issued to the public, although no final agreement between the two parties was ever reached. In addition, Mabie stated that it had submitted an application to the FDA seeking approval to manufacture the syringe. The statement failed to mention that the

FDA had put its application on hold because Maxxon had not provided sufficient information. Maxxon attempted to correct this information in mid-July, 2002.

The SEC brought the present lawsuit against Maxxon and Mabie, alleging violations of the securities laws stemming from these statements.[2] The complaint alleged, <u>inter alia</u>, that Maxxon and Mabie violated Section 10(b) of the Securities Exchange Act of 1934;[3] SEC Rule 10b-5;[4] and Section 17(a)(1)-(3) of the

---

[2] Thomas Coughlin, a medical advisor to Maxxon, and Rhonda Vincent, Maxxon's financial reporting manager, were initially parties to the lawsuit as well. Vincent settled with the SEC, and Coughlin was found not liable by the jury. Neither are a party to the present appeal.

[3] Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

[4] Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(continued...)

Securities Act of 1933.[5]

At the outset of trial, Maxxon and Mabie filed a motion in limine to exclude the report of Walter Rush, one of the SEC's expert witnesses. Rush's role was to analyze Mabie's stock trades to calculate illegal profits. The motion was denied, although the court ultimately ruled that Rush's testimony before the

---

[4](...continued)
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[5] Section 17(a), as amended, provides:

It shall be unlawful for any person in the offer or sale of any securities or any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C.A. § 77q(a).

jury should include only Mabie's personal stock trades and that stock sales by Mabie's trusts must be excluded. During cross-examination, however, it was established that the calculations Rush offered on direct examination had included the trusts; after an objection by Maxxon's and Mabie's counsel, the district court excluded the portion of Rush's testimony pertaining to the shares sold. Rush also played a role in the remedies phase of the trial; the SEC introduced a supplemental report compiled by Rush for the purpose of determining the amount of illegal profits gained by Mabie through sales of stock for the purposes of calculating the amount Mabie would be required to disgorge.

Maxxon and Mabie objected strenuously to the portion of the jury verdict form regarding alleged violations of Section 10(b) and Rule 10b-5. The final form asked the jury to find whether Maxxon and Mabie, respectively, had violated Section 10(b) and Rule 10b-5 "by knowingly or recklessly making false or misleading statements or omissions of material fact with respect to any one of the following," and then listed ten categories of alleged misrepresentations.[6] The

_____

[6] The ten alleged misrepresentations involved:

(a) the cost of producing the Maxxon syringe;
(b) OSHA requirements for safety syringes;
(c) whether the Maxxon syringe complied with OSHA requirements;
(d) whether Maxxon had received Orders for its syringe;
(e) whether Maxxon had begun manufacturing its syringe;
(f) whether Maxxon was engaged in negotiations with the Swedish Government;
(g) whether major healthcare companies had determined that Maxxon

(continued...)

form asked the jury to answer "yes" or "no" only once, thus requiring the jury to find that a violation had been committed but not to specify which one (or more) of the ten categories formed the basis for the jury's finding. The verdict form also included a space for the jury to indicate, if a violation was found, the earliest date on which a false or misleading statement was made. Maxxon and Mabie argued for a form that required (1) a "yes" or "no" answer as to each category and (2) a start and end date for any violations. The district court denied these requests. The jury returned a verdict finding Maxxon and Mabie had each violated Section 10(b) and Rule 10b-5 and that the earliest date of this violation was October 7, 1998.[7]

Following a hearing on the SEC's motion for remedies, the district court entered a final judgment against Maxxon and Mabie. After reciting its findings of fact and conclusions of law, the district court imposed the following remedies: it (1) permanently enjoined Maxxon and Mabie from violating Sections 10(b) and 17(a)(2)-(3) and Rule 10b-5; (2) prohibited Mabie from serving as an officer or

[6](...continued)
had the best syringe design in the world;
(h) whether major healthcare companies wanted to acquire Maxxon;
(i) whether the Patterson Group had signed an agreement to assist Maxxon; or
(j) the status of Maxxon's application for FDA approval.

[7] The jury also found that Maxxon and Mabie had violated Section 17(a)(2)-(3). Maxxon and Mabie do not appeal this finding.

director of any issuer of a certain class of securities for five years; (3) permanently barred Mabie from participating in any offering of "penny stock"; (4) ordered Mabie to disgorge the $433,228.52 in ill-gotten profits resulting from the securities violations (plus pre-judgment interest);[8] and (5) fined Mabie a civil penalty equal to the amount disgorged.

Maxxon and Mabie then filed a motion for a new trial. The district court denied the motion on the ground that it was untimely; the final judgment had been entered on March 11, 2005, and the motion was not filed until March 26, 2005—one day after Fed. R. Civ. P. 52(b)'s and 59(a)'s jurisdictional ten-day filing period ended. Following this ruling, Maxxon and Mabie appealed.

## DISCUSSION

Maxxon and Mabie raise five issues on appeal: (1) the jury should have been required to determine an end-date to the Section 10(b)/Rule 10b-5 violations; (2) the jury's finding that the October 7, 1998 draft press release constituted a violation of the securities laws is erroneous; (3) the findings of fact recited in the district court's final judgment are contrary to the jury's verdict; (4)

---

[8] The district court noted that an "appropriate calculation" of the amount Mabie should disgorge was over $600,000, which represented the "entire proceeds" of his stock gain between October 7, 1998 and July 15, 2002, the date that had been determined to be the relevant "end date" because that is when Maxxon and Mabie sought to correct some of the misleading statements. However, the SEC only sought disgorgement of $433,288.52, which was the total amount minus $0.28 per share, the market price of Maxxon stock on July 15, 2002, when the market re-valued the company based on the corrected information.

the district court erred in accepting Rush's supplemental report in determining remedies; and (5) the district court erred in denying Maxxon's and Mabie's motion for a new trial as untimely. Based in part on the limited record before us, we reject all of these contentions.

## I.

The verdict form asked the jury to determine, <u>inter alia</u>, (1) whether statements made by Maxxon and Mabie relating to various topics were false or misleading in violation of Section 10b and Rule 10b-5, and (2) if so, the earliest date on which such a statement was made. Maxxon and Mabie contend that these instructions were erroneous because the jury should have been required to "provide both a start date and a cut-off date for each violation."

To the extent that Maxxon and Mabie claim the jury was improperly instructed on the elements of a Section 10b/Rule 10b-5 claim (<u>i.e.</u>, that those claims require a finding of a cut-off date), we disagree. To establish a Section 10(b) and/or Rule 10b-5 violation, the SEC must prove the following: "(1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) scienter, and (4) use of the jurisdictional means." <u>Geman v. S.E.C.</u>, 334 F.3d 1183, 1192 (10th Cir. 2003) (Rule 10b-5) (quotation, alteration omitted); <u>see also</u> <u>In re PolyMedica Corp. Sec. Litig.</u>, 432 F.3d 1, 6 (1st Cir. 2005) (noting that the elements of a Section 10(b) claim and a Rule 10b-5 claim are the same). The date on which a violation ends is simply not a necessary element of proving a

- 9 -

violation.[9]

Maxxon and Mabie also argue that, without a jury finding as to the end-date of the violation, the district court could not properly calculate disgorgement. Disgorgement being remedial rather than punitive, see S.E.C. v. Cavanagh, 445

---

[9] Further, the jury instructions properly conveyed the elements of a Section 10(b)/Rule 10b-5 claim. See Grace United Methodist Church v. City Of Cheyenne, 451 F.3d 643, 660 (10th Cir. 2006) ("We review de novo whether, as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards."). The jury was instructed that:

> In order to prevail on the claim of a violation of Section 10(b) and Rule 10b-5, Plaintiff must establish each of the following elements by a preponderance of the evidence:
>
> 1. Defendants used an instrumentality of interstate commerce, or the mails, or a facility of national securities exchange, in connection with the sale of securities;
>
> 2. In connection with such purchase or sale, Defendants either:
>
> a. employed a device, scheme, or artifice to defraud, or
>
> b. made any untrue statement of a material fact, or omitted to state a material fact necessary to in order to [sic] make the statements that were made, in light of the circumstances under which they were made, not misleading, or
>
> c. engaged in an act, practice, or course of business that operated as a fraud or deceit on any person in connection with the purchase or sale of a security; and
>
> 3. Defendants acted with scienter or either knowing or reckless behavior.

F.3d 105, 116 & n.25 (2d Cir. 2006), some end-date determination is certainly

necessary so that the defendant is not required to disgorge profits not "causally

connected to the violation." Arnold S. Jacobs, Disclosures & Remedies Under the

Securities Laws § 20:109 (footnote omitted); cf. S.E.C. v. MacDonald, 699 F.2d

47, 52-55 (1st Cir. 1983) (en banc) (holding that disgorgement was appropriate

only as to the profits made prior to the time insider information was made public).

However, here, the district court did determine an end-date—July 15, 2002, the

date on which it found Maxxon and Mabie "first sought to correct some of their

misleading statements." "Disgorgement is by nature an equitable remedy as to

which a trial court is vested with broad discretionary powers." Jacobs, supra, at

§ 20:109 (footnotes omitted). So long as the end date chosen results in a

"reasonable approximation" of illegal profits, id., there is nothing wrong with the

court itself determining that date. See, e.g., SEC v. First Jersey Sec., Inc., 101

F.3d 1450, 1474-75 (2d Cir. 1996) ("The district court has broad discretion not

only in determining whether or not to order disgorgement but also in calculating

the amount to be disgorged.").[10]

## II.

As noted, the jury found that the earliest date of a Section 10(b)/Rule 10b-5

violation was October 7, 1998. Maxxon and Mabie contend that the only

---

[10] Although not clearly raised in this appeal, there is nothing in the record before us to establish that the end date selected by the court for purposes of calculating the disgorgement amount was inconsistent with the jury findings.

"statement" made on that date was the draft of a press release announcing that the Patterson Group had agreed to help Maxxon find a corporate buyer, and that this statement could not constitute a "material misrepresentation." Thus, Maxxon and Mabie argue, the district court should have granted their motion for judgment as a matter of law and/or a new trial, as the jury's verdict was in error.

Maxxon and Mabie's argument is, essentially, that (1) the October 7 draft press release was not made public and so cannot be deemed a material misrepresentation, (2) Patterson agreed to participate in finding a corporate buyer for Maxxon on October 9, and thus (3) the statement made in the draft release (i.e., the Patterson/Maxxon agreement) was accurate when the statement was "made" (e.g., when the press release was distributed) on October 14, 1998. The SEC contends that the October 9 communication from Patterson was not an agreement (as Patterson conditioned any agreement on receiving additional information and a $50,000 retainer from Maxxon), suggesting that the October 14 public release was, in fact, false.[11]

Neither the October 7 draft release, nor the October 9 communication, nor the October 14 release, nor the trial testimony concerning these releases is included in the record. Without these documents, we cannot evaluate this claim

---

[11] Further, the SEC claims that Patterson's president testified that, when he saw the October 14 release, he immediately contacted Maxxon and demanded a retraction.

and therefore must affirm.[12]  Scott, 216 F.3d at 912.

## III.

Maxxon and Mabie also argue that the findings of fact made in the district court's final judgment order "directly contradict" the jury's findings, as the findings include events and statements that occurred before October 7, 1998—the date that the jury found the Section 10(b)/Rule 10b-5 violations began.  We review the district court's findings of fact for clear error.  Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821, 829 (10th Cir. 2005).

Maxxon and Mabie do not claim that the district court took these pre-October 7, 1998 statements into consideration when fashioning remedies; they contend only that "[i]f the Jury found the Earliest Date of a misrepresentation to be October 7, 1998, it is clear error for the court to list eight statements made prior to October 7th."  (Emphasis added.)  The jury's verdict does not suggest that the pre-October 7 statements were not made, only that they were not violations. The findings of fact begin by stating that "Maxxon and Mabie made public statements promoting Maxxon to the public, some of which were found by the

_____

[12] The fact that the October 7 draft was not actually released to the public would not compel us to grant Maxxon and Mabie relief.  In that case, the evidence, taken in the light most favorable to the SEC, would show that the October 14 press release was a material misrepresentation in that it announced an agreement that had not, in fact, been finalized.  The jury could have concluded that Maxxon and Mabie hatched the scheme to make this false announcement on October 7, when they drafted the press release.

- 13 -

jury to have violated Section 10(b) and Rule 10b-5, as well as Sections 17a(2) and

(3)." (Emphasis added.)  This finding, and the subsequent recitation of pre-

October 7 statements, do not conflict with the jury's verdict.[13]

In addition, the jury found that Maxxon and Mabie violated both Section

10(b)/Rule 10b-5 and Section 17(a)(2)-(3).  The jury's Section 17(a) finding

included no start date.  Thus, even assuming the findings of fact were reciting the

pre-October 7 statements as statements violating the "securities laws," such a

finding would not be inconsistent with the jury's verdict on Section 17(a).

## IV.

Maxxon and Mabie raise two basic arguments concerning the district

court's acceptance of the supplemental report of the SEC's expert witness, Walter

Rush: (1) the report was based on facts not in evidence; and (2) the district

court's acceptance of the report violated Maxxon's and Mabie's due process

rights.  "We review a trial court's admission of expert testimony for abuse of

discretion, and we will reverse only when that decision is manifestly erroneous."

United States v. Dazey, 403 F.3d 1147, 1171 (10th Cir. 2005) (quotations

omitted).

---

[13] The district court did state that "[d]efendants' actions were not isolated incidents" and that "[m]isleading statements regarding the safety syringe were made over a period of years."  However, without a sufficient record, we cannot determine whether (and will not assume that) these references were to pre-October 7, 1998 actions and statements, nor could we determine the materiality of these statements.

## A.

The SEC submitted Rush's supplemental report after the liability phase of the proceedings and in anticipation of the remedies phase. According to the parties, this report calculated the disgorgement amount that was subsequently relied on by the district court. Maxxon and Mabie contend this was error, as the district court struck Rush's testimony <u>and</u> his original report at trial and, thus, the supplemental report was based on "unsupported" calculations—that is, facts not in evidence.[14]

The district court's docket indicates that before trial, Maxxon and Mabie moved to exclude Rush's original report and testimony. The motion was denied. At trial, Rush's original report was admitted and Rush testified to the number of shares of Maxxon stock sold by Mabie. On cross-examination, Rush admitted that this calculation was based on shares sold by Mabie <u>and</u> Mabie's trusts. Defense counsel objected to this testimony as contrary to the court's earlier ruling that the testimony should include only shares sold by Mabie. After discussion between the court and counsel, the court told the jury:

> Ladies and gentlemen, as a result of our efforts, we have identified some errors in the calculations of those shares that pertain to the stock

---

[14] Maxxon and Mabie also argue that the supplemental report contained "new calculations," implying that the calculations were based on evidence not in the initial report, and also that the supplemental report included calculations "that once again included the trusts which the Court had earlier ruled inadmissible." As neither the original nor the supplemental report are in the record, we decline to consider this argument. <u>See</u> 10th Cir. R. 10.3(B).

- 15 -

sold by Mr. Mabie. And with respect to those shares, you are to disregard the testimony that has been given to date.

(Emphasis added.)

Contrary to Maxxon's and Mabie's argument, then, there is no indication that Rush's report, or any of the data underlying it, was excluded by the district court at trial. Indeed, the district court itself stated that the report and underlying exhibits were not excluded at trial. In making findings of facts in its final judgment order (issued after the remedies stage of the proceedings), the court noted:

> The [supplemental] report clearly does not constitute new evidence. Rather, it represents argument based upon the evidence actually admitted at trial, namely, specifically identified exhibits and the expert report of Walter K. Rush.

Further, the only evidence in the record provided to us indicates that Rush's supplemental report was merely a "ministerial" recalculation of the data accepted into evidence at trial.[15] Thus, we cannot conclude that Rush's supplemental

---

[15] During the remedies, the following exchange occurred between the court and the SEC:

> THE COURT: But [SEC exhibits] 369, 370, and 371, which I don't have in front of me, but as I understand it, you are representing that a review of those exhibits will reflect all of [Mabie's stock] transactions . . . and the proceeds from those transactions. And all that Mr. Rush did [in his supplemental report] was to use the start date of October 7th, and using that start date, was able to perform the simple, almost ministerial task of calculating what all of those transactions were from these three exhibits?

(continued...)

report was unsupported.

**B.**

Maxxon and Mabie also argue that the acceptance by the district court of Rush's supplemental report during the remedies phase of the proceeding violated their due process rights because the district court accepted Rush's supplemental report without giving them an opportunity to cross-examine him. Assuming there exists a due process right to cross-examine a witness who presents information used in imposing civil remedies against a party, see Goldberg v. Kelly, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."), we cannot grant Maxxon and Mabie relief on that ground in this case.

Maxxon and Mabie concede that they were given the opportunity to cross-examine Rush during the jury trial. As noted above, the only evidence in the record before us indicates that Rush's supplemental report was, as the district court described, a "ministerial" re-calculation of data in the trial record. We thus see no reason why additional cross-examination during the remedies phase would be necessary to satisfy basic requirements of due process. As the record is

---

[15](...continued)
MR. TIBBETTS [counsel for the SEC]: That's correct . . . .

(Emphasis added).

- 17 -

insufficient to conclude that the supplemental report contained any information

that might trigger some right to cross-examine the report's author, we reject

Maxxon and Mabie's due process argument. Scott, 216 F.3d at 912.[16]

Maxxon and Mabie further argue that they were not allowed to present

evidence concerning the amount of disgorgement. Without the relevant portions

of the transcript of the remedies hearing, we are unable to review this claim. We

note, however, that the district court's final judgement expressly states that

Maxxon and Mabie "offered an alternative calculation for determining the value

of Defendant Mabie's ill-gotten gains." This suggests that Maxxon and Mabie

were, in fact, afforded some opportunity to present rebuttal evidence.[17]

## V.

Finally, Maxxon and Mabie argue that the district court erred in finding

----

[16] Maxxon and Mabie cite to a recent decision by the Eleventh Circuit to argue that due process requires a hearing before remedies are imposed. See S.E.C. v. Smyth, 420 F.3d 1225, 1232 (11th Cir. 2005). However, in Smyth, the district court imposed remedies for securities violations without affording the defendant any hearing at all. Id. at 1229-30. In contrast, the record in this case plainly indicates that the district court did hold a hearing on remedies. Maxxon and Mabie seem to be arguing that this hearing was inadequate to meet the basic requirements of due process. However, without the full transcript of the hearing, we cannot entertain this claim.

[17] In addition, Maxxon and Mabie claim that acceptance of Rush's supplemental report violated Fed. R. Civ. P. 26(e), which requires disclosure of "any additions or other changes" to an expert's testimony "at least 30 days before trial" "[u]nless otherwise directed by the court." Fed. R. Civ. P. 26(a)(3), (e)(1). We decline to consider this argument, as the record is insufficient to determine whether it was raised below. See, e.g., Robbins v. Wilkie, 433 F.3d 755, 772 (10th Cir. 2006) ("[W]e generally do not consider issues not raised below.").

their motion for a new trial untimely. According to Maxxon and Mabie, counsel attempted to file the motion electronically before the midnight filing deadline on March 25, 2005.[18] See Fed. R. Civ. P. 59(b) (allowing ten days from the entry of judgment for a motion for a new trial to be filed). However, due to technical problems,[19] the motion was not submitted until after the deadline. The district court ruled that Rule 59's time limits are jurisdictional, and thus it could not entertain the motion.

The district court's electronic filing system contains the following safeguards for late filings due to technical failures:

---

[18] The relevant order was entered by the district court on March 11.

[19] According to Maxxon and Mabie,

[counsel] had the filings complete and first attempted to file electronically at approximately nine pm Friday night March 25, 2005. There were technical difficulties first using the software to format the documents, than [sic] after an hour of effort around ten pm, the documents were correctly formatted. [Counsel] than [sic] attempt [sic] to transmit file the documents electronically from [counsel's] office, after over an hour of unsuccessful effort at approximately eleven pm [counsel] traveled to Kinkos with the filings on computer disc to attempt to use a different computer to electronically file the motions set forth above. The internet connections at Kinkos were first down, then operating painfully slow. At approximately 11:45pm [counsel] abandoned the Kinko's effort and woke up an attorney friend met her at her office were [sic] [counsel] was finally able to electronically file the motions at her office thirty eight minutes after midnight, which is technically Saturday morning.

- 19 -

COURT'S ECF SYSTEM
A technical failure exists when the ECF System is unable to accept filings continuously or intermittently over the course of any period of time greater than two (2) hours after 12:00 p.m. that day. Check the Court's website for postings regarding any other ECF System outages or downtimes. Should a filing be made untimely as the result of a technical failure of the Court's ECF System, the filer may seek appropriate relief from the assigned judge.

FILER'S SYSTEM
Problems on the filer's end, such as phone line problems, problems with the filer's Internet Service Provider (ISP), or hardware or software problems, will not constitute a technical failure under these procedures or excuse an untimely filing. Upon a showing of good cause, the assigned judge may grant appropriate relief for an untimely filing.

CM/ECF Instruction Manual, 2. Technical Information/Support/Hardware-

Software, available at http://www.oknd.uscourts.gov/okndpublic/cminstex.nsf/

e1df95432b8fe773862567ca00573ae3/8eaa0533de15e99186256e6e00537c58?Ope

nDocument (last visited Aug. 2, 2006.).

Maxxon and Mabie do not claim (nor does the record suggest) that they

sought any such relief. Without some attempt to ameliorate their late filing, the

district court did not err in ruling the motions untimely.[20]

_____

[20] Although the SEC seems to concede that the district court erred in denying the motion as untimely, "concession of a point on appeal . . . is by no means dispositive of a legal issue." Roberts v. Galen of Va., Inc., 525 U.S. 249, 253 (1999). In any event, Maxxon and Mabie's only argument on appeal is that, if we deem the motion timely filed, we should "rule on the merits." However, they do not include the motion in the record, thus we cannot determine what "the merits" are. Further, "[i]t is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for the appeal." Am. Airlines v. Christensen, 967 F.2d 410, 415 n.8 (10th Cir. 1992). This passing request to "rule on the merits" would not suffice to
(continued...)

## CONCLUSION

For the foregoing reasons, we AFFIRM.

---

[20](...continued)
present whatever arguments may be contained in the motion to this court on appeal.