# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 19, 2022

Lyle W. Cayce
Clerk

No. 21-10222

Securities and Exchange Commission,

*Plaintiff—Appellee*,

*versus*

Parker R. Hallam,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
No. 3:19-CV-1735

Before Smith, Elrod, and Oldham, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

Parker Hallam helped run a thicket of ersatz energy companies. When the SEC sued him for numerous securities violations, he agreed not to contest liability, and he agreed to certain remedies at a high level of generality. He appeals the particulars of the remedies ordered by the district court. Among other things, he says the court ignored *Liu v. SEC*, 140 S. Ct. 1936 (2020), when it ordered him to "disgorge" his ill-gotten gains. Because the district court had authority to impose the contested relief, we affirm.

No. 21-10222

I.

The SEC accused Hallam of violating antifraud[1] and registration[2] provisions of the Securities Act and antifraud[3] provisions of the Exchange Act and Rule 10b-5.  Hallam neither admitted nor denied those allegations but consented to a judgment containing four relevant prongs of relief.  *First*, he agreed to pay a civil penalty in an amount to be determined by the court.  *Second*, he agreed that the court could determine whether he should be permanently enjoined from dealing in securities except for his own account.  *Third*, Hallam agreed to "pay disgorgement of ill-gotten gains."  *Fourth*, he agreed to pay "prejudgment interest" on those gains, "based on the rate of interest used by the [IRS] for the underpayment of federal income tax."  The court entered judgment to those effects.

Nearly three years later, the SEC moved the district court to calculate the monetary remedies and enjoin Hallam from dealing in securities.  The SEC requested a finding that Hallam's ill-gotten gains totaled $1,901,480.  That figure derived from a forensic accounting firm's calculation of the total disbursements Hallam had received from the fraudulent entities within the statutory limitations period.  The SEC asked for "disgorgement" in that amount and calculated the prejudgment interest at $424,375.38.  It did not specify the appropriate civil penalty but requested that the court impose one of the options in the highest tier allowed by statute.

Before Hallam responded to the SEC's motion, the Supreme Court decided *Liu*, which identified constraints on the "disgorgement" remedy sought by the SEC.  More on that later.

---

[1] 15 U.S.C. § 77q(a).

[2] 15 U.S.C. § 77e.

[3] 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

2

No. 21-10222

*Liu* changed Hallam's tune.  He told the district court that *Liu* "banished" existing precedent on securities remedies, which he said vitiated his prior consent.  His brief focused on the SEC's supposed inability to force him to disgorge his profits.  But according to Hallam, *Liu* also foreclosed the SEC's ability to get prejudgment interest, a "penalty offset,"[4] or an injunction against his future securities dealings, even though *Liu* didn't directly address those topics.  In the alternative, Hallam requested a "live" evidentiary hearing to help the court "in the assessment of [which civil] penalty tier[ ]" to apply to his conduct.

Just before the district court ruled, Congress amended the Exchange Act explicitly to authorize "disgorgement" of wrongdoers' "unjust enrichment."[5]  Again, more on that later.

The district court rejected Hallam's positions entirely.  It denied his request for a hearing.  It read *Liu* to reaffirm disgorgement's availability in Exchange Act cases.  It relied on pre-*Liu* precedent to hold that the SEC was entitled to disgorgement.  Likewise, it concluded that *Liu* imposed no new constraints on the SEC's ability to get prejudgment interest, a "penalty offset,"[6] or an injunction against his future securities dealings.  And it didn't

---

[4] The SEC describes a "penalty offset" as an order preventing a securities defendant from later requesting that any civil penalty be deducted from any future compensatory damages that the defendant might be compelled to pay a third party in another lawsuit. That order is enforceable by repaying to the United States the amount of any such "offset" that is later ordered.

[5] The William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("2021 NDAA"), Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4625–26 (2021) (amending 15 U.S.C. § 78u).

[6] The court ordered that Hallam "shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on [his] payment of disgorgement in this action, argue that he . . . is entitled to . . . offset or reduction of such compensatory damages award by the . . . payment of a civil penalty in this action ('Penalty Offset'). If the court in any Related Investor Action grants such a Penalty Offset, [Hallam]

No. 21-10222

mention the (then very recent) statutory amendment.

The court entered final judgment ordering Hallam to pay $1,901,480 in "disgorgement" and $424,375.38 in prejudgment interest. It also imposed a civil penalty of an extra $1,901,480 after concluding that Hallam's conduct merited the highest amount provided by the Exchange Act: a penalty equal to his "pecuniary gain." Finally, the court enjoined Hallam from "participating . . . in the issuance, purchase, offer, or sale of any unregistered securities" except in regard to his own account.

Hallam appeals each of those orders and the denial of an evidentiary hearing. He says the lack of an evidentiary hearing denied him due process. He also renews three substantive challenges to the district court's remedies. *First*, he claims that the SEC failed to ground its request for "disgorgement" in a category of relief that was typically available in equity.[7] *Second*, he submits that prejudgment interest is permitted neither by the securities laws nor by equity jurisprudence. *Third*, he posits that the district court had no power to enjoin him from dealing in unregistered securities, which is ordinarily lawful. None of those contentions can defeat this judgment.

## II.

Hallam says he was entitled to a live hearing before being "deprived of [a] significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). Only that procedure, he claims, could have disentangled the "unusually complex set of facts, . . . lengthy chronology, and numerous transactions and parties" underlying the SEC's request for relief. At that hearing, Hallam maintains, he could have mounted "many challenges to the sufficiency and

---

shall . . . pay the amount of the Penalty Offset to [a fund created by the SEC]." Hallam does not appeal that order, so we do not consider its legality.

[7] *See Liu*, 140 S. Ct. at 1942; *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993).

content of the financial data . . . [that] formed the basis for the court's disgorgement award . . . and the credibility assessments necessary for the multi-faceted penalty-tier determination."

Part of that claim is new. Hallam never asked the district court for a live hearing to challenge the evidence establishing the financial transactions that unjustly enriched him. In his brief, he titled the tenth section "Request for Supplemental, Post-Discovery Briefing and a Hearing." He said that "the issues to be resolved *in the assessment of penalty tiers*" merited "the live appearance of the defendant[ ] for the Court to judge the veracity of his account and the sincerity of his testimony." (Emphasis added.) For the other issues, he noted that the court would have to "sift through competing versions of facts and challenged accountings," but he never said that had to happen in a courtroom. Instead, he requested "some limited discovery" and "supplemental briefing" on those questions.

So Hallam forfeited any right he may have had to a live hearing to hash out the details of his financial transactions. To preserve it for appeal, he was required to "press and not merely intimate" that due process claim "before the district court."[8] He didn't just fail to press the issue; he effectively disclaimed it by explicitly requesting a hearing on one set of issues but not the other—within the same section of his brief. That's why the district court understood his request for a hearing to relate only to his state of mind, such as whether he acted in "good faith" and "on the advice of an attorney, accountant, or auditor." Accordingly, we consider only whether Hallam was

---

[8] *Fontenot v. Colvin*, 661 F. App'x 274, 276 (5th Cir. 2016) (per curiam) (quoting *Hardman v. Colvin*, 820 F.3d 142, 152 (5th Cir. 2016)); *see also SEC v. Team Res. Inc.*, 942 F.3d 272, 279 (5th Cir. 2019) (holding that a securities defendant was not entitled to a live evidentiary hearing where it did not move the district court to conduct one and merely requested supplemental discovery), *vacated on other grounds*, 141 S. Ct. 186 (2020) (in light of *Liu*).

No. 21-10222

entitled to a live hearing regarding the appropriate civil penalty.

## A.

The process required to deprive someone of property depends on "the nature of the case." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950). The "essential requirements" are "notice and an opportunity to respond" to the government's position. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). Whether that opportunity to respond includes the right to provide live testimony depends on the extent to which a full hearing would aid the court in resolving complex, difficult issues of fact. *See Merriman v. Sec. Ins. Co. of Hartford*, 100 F.3d 1187, 1191–92 (5th Cir. 1996). So we must consider the question posed to the district court.

Both the Securities Act and the Exchange Act authorize civil penalties in a three-tiered structure.[9] Both statutes instruct courts to determine the "amount of the penalty . . . in light of the facts and circumstances."[10] The penalties allowed by each tier are capped by the greater of a fixed amount per violation or "the gross amount of pecuniary gain" that the violation created for the defendant.[11] The fixed amount is higher for higher tiers.[12] An offense makes a defendant eligible for a second-tier penalty if it "involved fraud,

---

[9] *Compare* 15 U.S.C. § 77t(d)(2), *with id.* § 78u(d)(3)(B).

[10] *Id.* § 77t(d)(2)(A); *id.* § 78u(d)(3)(B)(i).

[11] *Id.* § 77t(d)(2); *id.* § 78u(d)(3)(B).

[12] *Compare id.* §§ 77t(d)(2)(A), 78u(d)(3)(B)(i) (capping the first-tier per-violation penalty at "$5,000 for a natural person or $50,000 for any other person"), *with id.* §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii) (capping the second-tier per-violation penalty at "$50,000 for a natural person or $250,000 for any other person"), *and id.* §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii) (capping the third-tier per-violation penalty at "$100,000 for a natural person or $500,000 for any other person"). Those figures have been superseded by amendment and regulation, but that isn't relevant here. *See SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 781 (5th Cir. 2017).

No. 21-10222

deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."[13]  And it makes a defendant eligible for a third-tier penalty if it also "resulted in substantial losses or created a significant risk of substantial losses to other persons."[14]

But those provisions set only the maxima and provide courts with little guidance in fixing the amount.  Nor have we explained what factors that court must or may consider.[15]  Instead, we review a civil-penalty order for abuse of discretion.  *Life Partners Holdings*, 854 F.3d at 781.  A district court abuses its discretion when it omits a factor "that should be given significant weight,"[16] relies heavily on an irrelevant factor,[17] or unreasonably balances the relevant factors.[18]  *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 & n.4 (5th Cir. 2008) (en banc).  That standard leaves the district court substantial latitude in structuring its decisionmaking process.

The district court explained that it considered five factors in assessing

---

[13] 15 U.S.C. § 77t(d)(2)(B); *id* § 78u(d)(3)(B)(ii).

[14] *Id.* § 77t(d)(2)(C)(II); *id* § 78u(d)(3)(B)(iii)(bb).

[15] Other circuits have decided that question.  *See, e.g.*, *SEC v. Sargent*, 329 F.3d 34, 41–42 (1st Cir. 2003) ("In evaluating whether or not to assess civil penalties, a court may take seven [*sic*] factors into account, such as:  (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry."); *SEC v. Rajaratnam*, 918 F.3d 36, 44–45 (2d Cir. 2019) (declining to recognize or adopt an exclusive list of relevant factors).

[16] *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) (per curiam).

[17] *Cf. United States v. Scott*, 654 F.3d 552, 555 (5th Cir. 2011) (explaining that, in another context, a district court abuses its discretion by giving "significant weight to an irrelevant or improper factor").

[18] *Cf. Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981) (explaining, in another context, that a district court's "decision deserves substantial deference" under abuse-of-discretion review "where its balancing of [the relevant] factors is reasonable").

the appropriate penalty: (1) the seriousness of the offenses; (2) Hallam's state of mind; (3) the risk or realization of financial losses created by the conduct; (4) the frequency of the violations; and (5) Hallam's financial condition. It held that Hallam was eligible for a third-tier penalty because his conduct "involved fraud or deceit" and "caused substantial losses to other people." The court concluded (1) that Hallam's offenses were egregious; (2) that he was at least severely reckless; (3) that his violations caused investors to lose about $70 million; (4) that he continuously violated securities laws for more than four years; and (5) that he hadn't substantiated his claim to destitution.

Hallam doesn't directly challenge that reasoning—just the denial of a live hearing. So we assume without deciding that the district court's analysis was faithful to the securities laws. We ask only whether the nature of its inquiry entitled Hallam to "a full adversarial evidentiary hearing." *Loudermill*, 470 U.S. at 545.

## B.

Hallam answers that question affirmatively by relying on *SEC v. Smyth*, 420 F.3d 1225, 1230–33 (11th Cir. 2005). That appeal, like Hallam's, arose from proceedings that determined the amount of monetary remedies owed by a securities defendant who had agreed not to contest liability without specifying the gain or harm attributable to the wrongdoing. The district court rejected the defendant's request for a hearing and entered judgment ordering monetary remedies based on the record and the briefs. The Eleventh Circuit vacated that judgment. It explained that the due process right to be heard required an evidentiary hearing because the defendant had proffered "essential evidence" not already in the record. *Id.* at 1233.

The Eleventh Circuit tied its concerns to Federal Rule of Civil Procedure 55, which governs the entry of default judgments. As in this case, a default judgment was not entered in *Smyth*. But the court explained that

"[n]one of the Rules of Civil Procedure fits hand in glove the situation" presented when the SEC moves for judgment as to remedies after the defendant consents to an adverse judgment on liability. *Id.* at 1231 n.12. Rule 55(b)(2), it said, "most closely satisfies" the "common sense notions of justice that inhere in the Due Process Clause." *Id.*[19] And while Rule 55(b)(2) does not always require a hearing, *Smyth* "did not present one of the 'limited circumstances' under which the district court could properly exercise its discretion not to hold a hearing." *Id.* at 1233.

Hallam says we have "cited *Smyth* with approval." We have done no such thing. In *Team Resources*, 942 F.3d at 278–79, we distinguished *Smyth* as irrelevant because the defendant never requested a hearing, only extra discovery. *Id.* at 279. That decision was neither an embrace nor a rejection of our sister circuit's holding.

Nor do we now decide whether to adopt *Smyth*. It is once again easily distinguishable. *Smyth* relied on the promise of new, "essential" evidence to be introduced during the requested hearing. That's not true here.

To the extent that he has preserved the issue, Hallam says he wanted the hearing so that he could testify about his "scienter and good faith." He notes the "insight and perception gleaned from watching a witness'[s] demeanor and performance on the stand."

Maybe so. But even if that would have helped the district court assess his scienter, that would answer only a small part of the ultimate question: the

---

[19] That rule explains when default judgment can be entered in cases where the amount of monetary remedies is neither "certain" nor readily computable. *See* Fed. R. Civ. P. 55(b)(1), (2). The rule provides, "The court *may* conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2) (emphasis added).

appropriate penalty amount.  As we have explained, the district court enjoyed broad discretion in deciding what was relevant to that inquiry and how much weight to give each factor.

Hallam's scienter was far from the controlling factor in its analysis, which we have assumed to be permissible.  The court said only that if he had relied in good faith on "professional advice," it would "generally weigh against a high penalty amount."  In holding that he was eligible for a tier-three penalty, the court said it was relying on "all of the factors," but it chose to emphasize the length of time during which Hallam committed the violations and the amount of financial harm to investors—not his scienter.

What's more, the consent agreement prevented Hallam from contesting facts highly probative of his scienter.  He agreed that the allegations in the First Amended Complaint "shall be accepted as and deemed true."  That complaint accused him of violating the Securities Act "knowingly or with severe recklessness."  It did the same thing regarding the Exchange Act.  If that wasn't enough, the granular factual allegations explained how Hallam "directed the [fraudulent] firms' sales efforts" for years, approved sales materials containing misrepresentations within his knowledge, approved cash transfers among fraudulent corporate entities, and pocketed investors' money.  Hallam's self-serving proclamations of good faith, live or written, were nearly worthless against that mountain of incontrovertible contrary evidence.

This is, in other words, far from a case in which the defendant sought to introduce "essential evidence" not already in the record.  *Smyth*, 420 F.3d at 1233.  Hallam sought to introduce evidence barely probative of a single factor in a multi-factor, highly discretionary inquiry.  *Smyth* is inapposite.

So we do not decide whether or under what circumstances the Due Process Clause compels a district court to hold a live hearing before fixing a

No. 21-10222

civil penalty amount. Federal Rule of Civil Procedure 78(b) permits district courts to "determin[e] motions on briefs, without oral hearings." Hallam agreed that the amount of the civil penalty would "be determined by the Court upon motion of the Commission." The SEC then moved the court to enter judgment ordering Hallam to pay the civil penalty. Deciding the amount on the record and briefs was consistent with the rules of civil procedure and the parties' agreement.

Even if the demands of due process can supersede that procedure, they can't do that here. Hallam can't show that live "testimony could have . . . altered the impact" of the other evidence of his scienter.[20] Nor can he show that another finding on scienter could have overcome the other factors on which the court relied. The district court did not abuse its discretion by denying him a live hearing.

### III.

We now consider the impact of Hallam's consent agreement on his remaining contentions. He agreed to "pay disgorgement of ill-gotten gains [and] prejudgment interest thereon." He further agreed that the interest would be "based on the rate of interest used by the [IRS] for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." And he accepted that the district court could "determine *whether* [he] should be permanently restrained and enjoined" from dealing in securities on others' behalf. (Emphasis added.) The SEC says Hallam's consent to those remedies forecloses some of his contentions.

---

[20] *Plummer v. Univ. of Hous.*, 860 F.3d 767, 776 (5th Cir. 2017); *see also Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (explaining that one of the factors used to identify "the specific dictates of due process" is "the probable value, if any, of [the] additional . . . procedural safeguard[ ]").

No. 21-10222

Hallam disagrees. He points out that "parties may not, by consent and agreement, confer power on the court to impose unauthorized equitable remedies." And he maintains that the district court was "without discretion to impose" any of the "unauthorized equitable remedies" described above.

Ordinarily, a party may not appeal an issue decided by a consent judgment. *Ybarra v. Dish Network, LLC*, 807 F.3d 635, 639–40 (5th Cir. 2015). Hallam identifies a special case where *prospective* orders, once agreed to, can be modified because of "significant change[s] in either factual conditions or in law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992). That occurs where, for instance, "changed factual conditions make compliance with the decree substantially more onerous," *id.*, or "one or more of the obligations placed upon the parties has become impermissible under federal law," *id.* at 388.[21] Hallam cites only cases concerning such prospective relief.[22]

But only one contested aspect of the judgment is prospective: the injunction against dealing in unregistered securities. As to that remedy, the consent agreement established nothing new. It said only that the district court "shall determine" the propriety of the injunction. The court would have had that power anyway. Both the Securities Act and the Exchange Act authorize the SEC to seek injunctions to prevent securities violations.[23]

Similarly, the consent judgment has little to say about disgorgement. It provides only that Hallam "shall pay disgorgement of ill-gotten gains."

---

[21] *See also* FED. R. CIV. P. 60(b)(5)–(6).

[22] *Viz. United States v. Swift & Co.*, 286 U.S. 106, 110–114 (1932); *Sys. Fed'n No. 91, Ry. Emps.' Dep't v. Wright*, 364 U.S. 642, 644 (1961); *Rufo*, 502 U.S. at 372–77; *Agostini v. Felton*, 521 U.S. 203, 209–14 (1997); *LULAC, Dist. 19 v. City of Boerne*, 659 F.3d 421, 436 (5th Cir. 2011); *Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 720, 740–41 (5th Cir. 2016).

[23] 15 U.S.C. §§ 77t(b), 78u(d)(1).

Determining the precise meaning of "disgorgement" is no easy task. Nor does the agreement specify the method for calculating Hallam's "ill-gotten gains," much less provide a number. It says only that the district court must determine the amount.

So the consent judgment doesn't prevent Hallam from challenging either the injunction or the disgorgement award. It has no effect on the propriety of the injunction, a question to which we return *infra* Section IV. And it forecloses Hallam only from challenging the SEC's ability—under *any* circumstances—to get a disgorgement award. But he hasn't done that. Instead, he claims that the SEC failed to ground its request in the categories of relief typically available in equity jurisprudence. That contention is consistent with the language of the consent judgment, even if it is legally mistaken. Accordingly, we fully consider it *infra* Section V.

But the consent judgment has more bite regarding Hallam's challenge to the prejudgment interest rate. Hallam now urges that the prejudgment interest award is inconsistent with limits on equity jurisprudence and amounts to a penalty. We do not consider those challenges because Hallam agreed to pay the specific interest rate that the district court applied.[24] In doing so, he waived the contentions he raises on appeal.

---

[24] The court applied the "IRS rates of interest on tax underpayments and refunds" during the quarters in which Hallam's wrongdoing occurred, as the consent judgment provided. That rate "is a floating rate which is adjusted each quarter [to approximate] the time value of money for each quarter in which the wrongdoer has the benefit of the funds." Applying that calculation to Hallam's wrongdoing yielded $424,375.38. That sum assumes that the amount of his disgorgement award was correct. Because the court affirms that amount, *see infra* Section V, there is no need to recalculate the interest award. Hallam has never identified any error in transcribing the IRS interest rate or calculating the total from the amount of the disgorgement award.

No. 21-10222

IV.

Hallam has also forfeited his challenge to the district court's "conduct-based injunction" (capitalization altered), but for another reason. The court "permanently enjoined [him] from participating, directly or indirectly . . . in the issuance, purchase, offer, or sale of any unregistered securities . . . [except] for his own personal account." Selling unregistered securities is sometimes lawful.[25] But the court concluded that it was authorized to enjoin Hallam anyway because it found him "reasonabl[y] likel[y]" to violate the securities laws again.

The district court explicitly claimed authority to issue the injunction from 15 U.S.C. §§ 77t(b) and 78u(d)(1). Those provisions authorize district courts to enjoin securities defendants "engaged or . . . about to engage in any acts or practices which constitute . . . a violation" of certain provisions of the securities laws.[26] Section 77t(b) also allows injunctions against "acts or practices which . . . *will* constitute" violations of the provisions to which it applies. (Emphasis added.)

Hallam urges this court to vacate the injunction because an "injunction against future participation in the sale or issuance of securities is not a remedy Congress chose to include in the Securities or Exchange Act." In his opening brief, he says Congress has impliedly precluded other forms of injunctive relief by including the explicit injunctive authorizations at "15 U.S.C. §§ 77e(a) and (c), 77t(e), and 78u(d)(2)." Notably absent from that list are Sections 77t(b) and 77u(d)(1)—the provisions on which the district court relied. Nor does Hallam elsewhere explain why the court was wrong about what those provisions permit. Indeed, by Hallam's admission,

---

[25] *See generally* 15 U.S.C. §§ 77c, 77d; 17 C.F.R. § 230.144.

[26] 15 U.S.C. § 77t(b); *accord id.* § 78u(d)(1) (using nearly identical language).

he "did not 'address' these statutes [because] they provide no authority for a court to enjoin a defendant from engaging in future lawful conduct."

That decision was mistaken. "[A]ny issue not raised in an appellant's opening brief is forfeited." *United States v. Bowen*, 818 F.3d 179, 192 n.8 (5th Cir. 2016). One way that an appellant can forfeit an argument is "by failing to adequately brief the argument on appeal." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). To be adequate, a brief must "address the district court's analysis and explain how it erred." *Id.* at 397 n.1 (citing *Brinkmann v. Dallas Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987)). Hallam failed to do that. So we do not consider his position.

## V.

Finally, we arrive at the thorniest issue presented by Hallam's appeal: whether the district court erred by ordering him to pay a "disgorgement" award based on this circuit's pre-*Liu* caselaw. We conclude that it did not err.

## A.

The concept of "disgorgement" as a securities remedy is essentially the product of a runaway mutation. It found its way into our jurisprudence after the Second Circuit spliced it into the Exchange Act's general grant of jurisdiction. It then leaked from that laboratory and spread rapidly to each regional circuit, including ours.

"Disgorgement" has never been a precise legal term.[27] Nonetheless, we must try to understand it with as much precision as it will bear because the outcome here depends on it. To do that, we have two lodestars. First is *Liu*'s conclusion that disgorgement awards—if not their label—are deeply rooted in historical equity jurisprudence. Second is a recent statutory

---

[27] *See, e.g.*, *infra* notes 88–89 and accompanying text.

amendment that, for the first time, explicitly added "disgorgement" to the list of remedies available in civil securities enforcement proceedings. To contextualize those developments, we begin by more thoroughly summarizing the history of the remedy of disgorgement.

1.

The original Exchange Act contained little remedial detail. *See* Securities Exchange Act of 1934, Pub. L. No. 73-291, tit. I, §§ 1–34, 48 Stat. 881, 881–905 (1934). It empowered courts to enjoin "acts or practices which constitute or will constitute a violation of the [Exchange Act]." *Id.* § 21(e) at 900. It gave certain courts "exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce [the Act]." *Id.* § 27 at 902–03. And it explained that "[t]he rights and remedies [it created] shall be in addition to . . . all other rights and remedies . . . at law or in equity." *Id.* § 28 at 903.

In 1971, the Second Circuit became the first federal appeals court to interpret the Exchange Act to permit the recovery of "restitution of profits." *SEC v. Tex. Gulf Sulphur Co.*, 446 F.2d 1301, 1307 (2d Cir. 1971) (capitalization altered); *Liu*, 140 S. Ct. at 1940–41; *id.* at 1952 (Thomas, J., dissenting). But it found no "specific statutory authority" for that remedy. *Tex. Gulf Sulphur*, 446 F.2d at 1307. Instead, it grounded "restitution" in the "general equity power" conferred by the Exchange Act. *Id.* It held that "the SEC may seek other than injunctive relief in order to effectuate the purposes of the Act, so long as such relief is remedial relief and is not a penalty assessment." *Id.* at 1308. It upheld an award ordering the defendants to repay "the profits they had derived" from their securities violations. *Id.* at 1307.

The following year, the Second Circuit elaborated. For the first time in appellate securities law, it used the term "disgorge" to refer to the repayment of profits. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972). It reiterated that "neither the [Securities] nor [the Exchange]

No. 21-10222

Act[ ] specifically authorize[s]" that remedy, *id.*, but declared that "it is for the federal courts to adjust their remedies so as to grant the necessary relief where federally secured rights are invaded," *id.* (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)) (alterations adopted). "[R]equiring the disgorging of proceeds" was necessary, it explained, to "make violations unprofitable" and preserve the securities laws' "deterrent effect." *Id.* at 1104. But it limited that remedy to recovering the ill-gotten gains without including the "profits and income earned on the proceeds," *id.*, consciously allowing wrongdoers to profit from their temporary possession of the funds.[28]

The Second Circuit's decisions suggest two things. *First*, it thought it was creating a new remedy. Its partial reliance on *Borak* shows that it was performing its "duty . . . to be alert to provide such remedies as are necessary to make effective the congressional purpose." *Borak*, 377 U.S. at 433. After all, *Texas Gulf Sulphur* and *Manor Nursing* were decided before *Cort v. Ash*, 422 U.S. 66, 78 (1975), and other cases abrogated that understanding of the role of federal courts.

*Second*, the circuit's conception of "disgorgement" was essentially restitutionary, although it was slightly narrower. Like all restitution, it was measured by the defendant's gain, not the injured party's loss.[29] But the court's categorical exclusion of income earned on the proceeds of wrong-

---

[28] *Manor Nursing*, 458 F.2d at 1104–05 ("While compelling the transfer of the profits on the proceeds arguably might add to the deterrent effect . . . , this in our view does not justify arbitrarily requiring those appellants who invested wisely to refund substantially more than other appellants.").

[29] *Compare* 1 DAN B. DOBBS, DOBBS LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION 552 (2d ed. 1993) (The purpose of restitution "is to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction."), *with* RUSSELL L. WEAVER ET AL., PRINCIPLES OF REMEDIES LAW 167 (3d ed. 2017) ("Compensatory damages seek to place . . . the victim of a legal wrong[ ] in . . . her 'rightful position'[ ].").

doing is inconsistent with an unqualified importation of the principles of restitution, which permit an injured party to recover a conscious wrongdoer's earnings on his property after the proper showing.[30]

In any event, not long after the Second Circuit decisions, the Fifth Circuit adopted the disgorgement remedy. In *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978), we held that a district court "acted properly within its equitable powers" by ordering a securities defendant to "disgorge the profits that he obtained by fraud" (citing *Manor Nursing*, 458 F.2d at 1104). We called disgorgement "restitution" and "remedial and not punitive" and agreed with the Second Circuit that disgorgement could not include "income earned on ill-gotten profits." *Id.*

A later Fifth Circuit opinion deepened the terminological confusion. In *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993), we described *Blatt*'s reasoning as containing only a "casual reference[ ]" to the law of restitution. We explained that "disgorgement is not precisely restitution" because it "wrests ill-gotten gains from the hands of a wrongdoer." *Id.* We continued: "Disgorgement does not aim to compensate the victims of the wrongful acts, as restitution does." *Id.* That seems to get matters precisely backwards, given that restitution's defining feature is its measurement by the wrong-doer's gain and not the victim's loss. But the word "restitution" as used in

---

[30] *Olwell v. Nye & Nissen Co.*, 173 P.2d 652, 654 (Wash. 1946) ("In s[ome] cases the measure of restitution is determined with reference to the tortiousness of the defendant's conduct or the negligence or other fault of one or both of the parties in creating the situation giving rise to the right to restitution. . . . If [the defendant] was consciously tortious in acquiring the benefit, he is also deprived of any profit derived from his subsequent dealing with it.") (quotation and emphasis omitted). *Olwell* concerned legal—not equitable—restitution in an assumpsit action. *Id.* But the same sort of recovery was available in equitable restitution. RESTATEMENT (FIRST) OF RESTITUTION § 202 & cmt. c (AM. L. INST. 1936).

*Huffman* referred to a term contained in an unrelated federal statute,[31] not the law of remedies generally. *Huffman* held only that a disgorgement award was not a "debt" under that statute, *id.* at 803, so it did not repudiate disgorgement's foundations as established by *Blatt*, *Texas Gulf Sulphur*, and *Manor Nursing*.

The D.C. Circuit was the first to articulate the prevailing standard for quantifying a disgorgement award. In *SEC v. First City Financial Corp.,* 890 F.2d 1215, 1231 (D.C. Cir. 1989), it held that "disgorgement need only be a reasonable approximation of profits causally connected to the violation." It established a burden-shifting framework in which the government must first demonstrate that an amount reasonably approximated a defendant's unlawful gain. *Id.* at 1232. If the government does so, the burden shifts to the defendant to rebut that showing by demonstrating "a clear break in or considerable attenuation of the causal connection between the illegality and the ultimate profits." *Id.* (citing *Manor Nursing*, 458 F.2d at 1104).

Every regional circuit has since adopted or applied that framework.[32] We have done so—albeit in an unpublished decision—to affirm a disgorgement award while explaining that the standard of review was abuse of discretion. *SEC v. Halek*, 537 F. App'x 576, 581 (5th Cir. 2013). And we have applied it "*arguendo*" in holding that an award termed "disgorgement," but

---

[31] The Federal Debt Collection Procedures Act of 1990. *Huffman*, 996 F.2d at 801.

[32] *See SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004); *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996); *SEC v. Teo*, 746 F.3d 90, 105–07 (3d Cir. 2014); *HUD v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 927 (4th Cir. 1995); *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007); *SEC v. Zada*, 787 F.3d 375, 382 (6th Cir. 2015); *SEC v. Durham*, 799 F. App'x 928, 930 (7th Cir. 2020) (per curiam); *SEC v. Lawton*, 449 F. App'x 555, 556 (8th Cir. 2012) (per curiam); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010); *SEC v. Curshen*, 372 F. App'x 872, 883 (10th Cir. 2010); *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).

based in Texas tort law, had failed to meet the "reasonable approximation" part of the standard. *Allstate*, 501 F.3d at 412–14. But we have never formally adopted it in a published opinion as the standard for calculating the amount of disgorgement awards.[33]

Meanwhile, in 2002, Congress added remedial language to the codified Exchange Act.[34] Under the subsection containing the paragraph that authorizes courts to enjoin violative "acts or practices,"[35] which we mentioned earlier, it added a new paragraph: "In any action or proceeding brought [by the SEC] under any provision of the securities laws, [the SEC] may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."[36]

We did not address that amendment in *Allstate*, *Seghers*, or *Halek*. We did not even cite that language until 2020, after *Liu* was decided.[37] What's more, no circuit appears to have referenced that amendment in support of its disgorgement jurisprudence until 2015.[38]

---

[33] We also referred to the burden-shifting framework in *SEC v. Seghers*, 404 F. App'x 863, 864 (5th Cir. 2010) (per curiam), in which we held that the district court had not abused its discretion in concluding that the SEC had failed to meet its "reasonable approximation" burden.

[34] Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, tit. III, § 305(b), 116 Stat. 745, 778–79 (2002).

[35] Securities Exchange Act § 21(e) (codified at 15 U.S.C. § 78u(d)(1)).

[36] Sarbanes-Oxley Act § 305(b) (codified at 15 U.S.C. § 78u(d)(5)).

[37] *See SEC v. Team Res., Inc.*, 815 F. App'x 801, 801 (5th Cir. 2020) (per curiam) (remanding in light of *Liu*); *SEC v. Blackburn*, 15 F.4th 676, 681 (5th Cir. 2021).

[38] *See SEC v. Custable*, 796 F.3d 653, 654 (7th Cir. 2015); *SEC v. Quan*, 817 F.3d 583, 594 (8th Cir. 2016); *SEC v. Kokesh*, 834 F.3d 1158, 1164 (10th Cir. 2016), *rev'd on other grounds*, *Kokesh v. SEC*, 137 S. Ct. 1635 (2017); *SEC v. World Cap. Mkt., Inc.*, 864 F.3d 996, 1003 (9th Cir. 2017).

The Supreme Court first addressed this sort of disgorgement in 2017. *See Kokesh*, 137 S. Ct. at 1639. But it held only that "[d]isgorgement, as it is applied in SEC enforcement proceedings, operates as a penalty under [a general statute of limitations]." *Id.* at 1645. It flagged and reserved the question "whether courts possess authority to order disgorgement in SEC enforcement proceedings or . . . whether courts have properly applied disgorgement principles in this context," and it didn't speculate as to where in the securities laws any such authority might be found. *Id.* at 1642 n.3. That acknowledgement teed up *Liu*.

2.

In *Liu*, the Court held, 140 S. Ct. at 1940, that "a disgorgement award [meeting certain conditions] is equitable relief permissible under § 78u(d)(5)"—that is, the "any equitable relief" language added by the 2002 amendment. As it first had in *Mertens*, 508 U.S. at 256, the Court interpreted the nebulous, though nearly ubiquitous, statutory term "equitable relief" to mean "those categories of relief that were *typically* available in equity." *Liu*, 140 S. Ct. at 1942. To decide whether disgorgement, as it had been ordered by courts since *Texas Gulf Sulphur*, was consistent with historical equity practice, the Court consulted "works on equity jurisprudence." *Id.*

The Court concluded that a remedy stripping wrongdoers of their profits is consistent with equity practice so long as it conforms to two important limitations. *First*, the award cannot exceed the "net profits from wrongdoing," which must account for the "actual gains and profits" attributable to the wrong and "deduct[ ] legitimate expenses." *Id.* at 1942–46 (quotation omitted).[39] *Second*, the award must be "for the benefit of investors," *id.*

---

[39] This limitation contains a sub-limitation on disgorgement awards based on joint-and-several liability. Because the award may not exceed net profits, courts must pay careful attention to determining the profits each wrongdoer received. *Liu*, 140 S. Ct. at 1949.

at 1949, which is to say that it must reflect the notion from equity that a wrongdoer may be treated as a sort of trustee *ex delicto*, who is considered to hold the property on behalf of the wronged, *id.* at 1944.[40]

So the Court explained that the core of modern disgorgement jurisprudence was sufficiently rooted in equity but that courts had sometimes strayed in applying it. *Id.* at 1946. It "le[ft] it to the lower court[s]," *id.* at 1950, to decide in the first instance the extent to which particular aspects of disgorgement-award calculation are consistent with those broad principles, *id.* at 1947–50.

But a more fundamental question remains. Are those broad limitations on disgorgement awards the *only* limitations necessary to comply with historical equity practice? Or must attempts to get "disgorgement" *also* satisfy the particular elements of a traditional equitable remedy?

To re-frame the question slightly: Did the *Liu* Court recognize "disgorgement" as an independent equitable remedy that is consistent with historical practice—terminological differences notwithstanding—so long as it stays within the Court's enumerated limitations? Or did it recognize that the Exchange Act permits courts to award traditional profit-stripping remedies—all of which share the Court's enumerated limitations—under the label "disgorgement?"

Language in *Liu* lends support to both readings. On the one hand, the

---

Wrongdoers must be held responsible "for such profits only as have accrued to themselves and not for those which have accrued to another, . . . in which they have no participation." *Id.* (quotation omitted and alteration adopted). There may be an exception to that principle for "partners engaged in concerted wrongdoing," but that exception's contours haven't yet been defined. *Id.*

[40] *See also* 4 John Norton Pomeroy & John Norton Pomeroy Jr., A Treatise on Equity Jurisprudence § 1053, at 119–21 (5th ed. 1941).

Court described deprivation of net profits as a single "remedy" that has "gone by different names." *Id.* at 1942.[41] It explained that this remedy has generalizable features "[n]o matter the label." *Id.* at 1943. It noted the remedy's "protean character." *Id.* (quotation omitted). And it referred to one traditional equitable action as "closely resembling disgorgement," *id.* at 1940 n.1, which implies that the former is not a sub-category of the broader label "disgorgement."

On the other hand, the Court sometimes talked about disgorgement as a category of remedies.[42] For instance, it observed that "the profits remedy *often* imposed a constructive trust on wrongful gains." *Id.* at 1944 (emphasis added). That statement supports the second reading because a constructive trust is an independent, equitable restitutionary remedy with its own requirements.[43] The Court also expressed concern that ordering a "joint-and-several liability" form of disgorgement could "transform *any* equitable profits-focused remedy into a penalty." *Id.* at 1949 (emphasis added). It referred to disgorgement as a "profit-based measure of unjust enrichment," *id.* at 1943 (quotation omitted), which tends to support the second reading because unjust enrichment is not a particular restitutionary remedy but the basis for all restitution.[44]

Further supporting the second reading, the opaque language in *Liu*

---

[41] We hereinafter refer to this potential meaning of *Liu* as the "first reading."

[42] We hereinafter refer to this potential meaning of *Liu* as the "second reading."

[43] 1 DOBBS, *supra* note 29, at 587–600; 4 POMEROY, *supra* note 40, § 1044, at 93–97. Moreover, at least one of those requirements is inconsistent with how courts have ordered "disgorgement," as we explain *infra* notes 46–49 and accompanying text.

[44] *See* RESTATEMENT (FIRST) OF RESTITUTION § 1 (AM. L. INST. 1936) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other.").

may generally be explained by the Court's conviction that the "label affixed" to a remedy should not be permitted to "elevate form over substance." *Id.* at 1941 n.1 (quotations omitted). That principle counsels emphasis on the question "whether the underlying profits-based award conforms to equity practice," *id.*, which may be the question that any court confronting a request for "disgorgement" must ask anew.

The first reading is probably more natural. But there is a substantive reason to adopt the second reading. The Court has used the same *Mertens* test to interpret very similar language—"appropriate equitable relief"—in ERISA.[45] In that context, it was careful to preserve the particular requirements of the underlying equitable remedies, including, for instance, the requirement for a constructive trust that "money or property identified as belonging . . . to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002). So the Court's reliance on *Mertens* in *Liu* may mean that it intended to do so again.

The difference between the two readings of *Liu* is consequential. If, to get disgorgement, the SEC must satisfy the elements of an equitable restitutionary remedy, it faces a much higher bar than it did before *Liu*. The parties have identified two candidate remedies, which are also the remedies identified by the *Liu* Court as historically grounding "disgorgement." Each suggested remedy has salient limitations.

The first remedy is a constructive trust. We have just mentioned its defining requirement, which is sometimes called "tracing." It can only be

---

[45] *See* 29 U.S.C. § 1132(a)(3)(B); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 212 (2002); *SEC v. Camarco*, No. 19-1486, 2021 WL 5985058, at *21–22 (10th Cir. Dec. 16, 2021) (unpublished) (Bacharach, J., dissenting).

"used when the defendant has a legally recognized right in a particular asset."[46]  Equity considers that asset to be held on behalf of the wronged party.  So the wronged party may recover that party's interest by identifying that precise asset or tracing anything that has been "substituted for it."[47]

That requirement is onerous, but it sometimes imparts a benefit to the wronged party because the asset may appreciate in value or may be exchanged for something more valuable, providing the party with "remedies far more complete than the compensatory damages obtainable in courts of law."[48]  To satisfy the tracing requirement, if there is one, the SEC would need to identify particular funds from the fraudulent businesses that are still in Hallam's possession—or assets that he purchased with those particular funds, tracked all the way through the chain of possession.  In that context, money isn't considered fungible.[49]

The second remedy, which is also sometimes also called an action,[50] is an "accounting" or an "accounting for profits."  The purpose of an accounting is to determine how much profit a wrongdoer got "from improper use of the plaintiff's property or entitlements" and force him to return it to the

---

[46] 1 DOBBS, *supra* note 29, at 591.

[47] *Id.* at 590.

[48] 4 POMEROY, *supra* note 40, § 1044, at 96.

[49] *See, e.g.*, *Rosenberg v. Collins*, 624 F.2d 659, 663 (5th Cir. 1980) ("Under the present circumstances, none of the customers of the bankrupt could successfully trace his or her funds so as to sustain . . . a constructive trust theory because all of the funds from the 900 customers of the bankrupt were co-mingled in a single back account . . . .").

[50] *See, e.g.*, 4 POMEROY, *supra* note 40, § 1420, at 1076 ("The action of account-render was one of the most ancient actions known to the common law. . . . [But] the action of account-render fell into disuse, and a jurisdiction in equity to entertain suits for an accounting grew up.") (footnoted omitted); *McMaster v. Gould*, 276 U.S. 284, 285 (1928) ("The petitioners brought an action in equity . . . for an accounting of syndicate funds.").

plaintiff.[51]  Recovering funds in an accounting doesn't require the plaintiff to trace his funds to some particular account.[52]  But the parties dispute whether an accounting remedy carries another requirement: that the defendant possess some definable item (a *res*) belonging to the plaintiff that generates an uncertain amount of profit.

The SEC says accounting "did not involve a *res* or tracing."  It's unclear whether the SEC here uses the term "*res*" to refer to a profit-generating item or just to the tracing requirement (in the sense that tracing requires a plaintiff to identify his property in the form of a "particular *res* or fund of money").[53]  But all of its sources for that proposition refer only to the lack of a tracing requirement.[54]  And Hallam retorts that the SEC couldn't satisfy the threshold requirements to get an equitable accounting, tracing aside.

Equitable accounting really refers to "three different remedies,"[55] but only one form could be relevant here.  The first form applies when a legal accounting is impossible because "the accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them."[56]  That applies in only "rare case[s]" implicating extraordinary com-

---

[51] 1 Dobbs, *supra* note 29, at 610.

[52] *Id.* at 588 ("Unlike the [constructive] trust . . . , accounting does not seek any particular *res* or fund of money; the defendant will be forced to yield up profits, but the defendant can pay from any monies he might have, not some special account.").

[53] *Id.*

[54] *See id.* at 588; 4 Pomeroy, *supra* note 40, § 1416, at 1070; 2 Restatement (Third) of Restitution & Unjust Enrichment § 51 cmt. b (Am. L. Inst. 2010).

[55] 1 Dobbs, *supra* note 29, at 609.

[56] *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (quotations omitted).

plexity that not even an appointed special master can help a jury unravel.[57] There is no reason to think it would apply here. The second variety is an antediluvian form of discovery that has "little or no use today" under the Federal Rules of Civil Procedure.[58] The third, relevant, form returns to the wronged party "gains received from improper use of the plaintiff's property or entitlements" and gives the "defendant the burden of proving appropriate deductions for expenses he incurred in reaping those profits."[59]

The only relevant form of accounting thus requires an identifiable *res* that "produces profits or income."[60] That principle is illustrated by *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940). MGM stole the plot of the plaintiffs' play and adapted it into the screenplay that served as the basis for a film.[61] *Id.* at 396–97. The Supreme Court affirmed the district court's grant of an accounting for profits, which was intended to determine the portion of the film's net profits attributable to the stolen screenplay instead of other aspects of its "production and direction." *Id.* at 398, 406–09. That sort of accounting remedy was common in intellectual-property cases.[62] That's because those cases squarely present the problem of having to distinguish between the portion of profits attributable to the intellectual property—the profit-generating *res*—and other parts of the production process. Without

---

[57] *Id.*

[58] 1 DOBBS, *supra* note 29, at 610; *see also* FED. R. CIV. P. 26(b), 34.

[59] 1 DOBBS, *supra* note 29, at 610.

[60] *Id.* at 588; *Knudson*, 534 U.S. at 214 n.2.

[61] LETTY LYNTON (Metro-Goldwyn-Mayer 1932).

[62] *See, e.g.*, *Providence Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788, 789, 801–04 (1869); *Birdsall v. Coolidge*, 93 U.S. 64, 68–69 (1876); *City of Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 138 (1877); *Root v. Lake Shore & M.S. Ry. Co.*, 105 U.S. 189, 194 (1881); *Callaghan v. Myers*, 128 U.S. 617, 663–67 (1888).

that problem, there is no need for an equitable accounting because the sum owed is certain and "the remedy at law is entirely adequate."[63]

The SEC's request for disgorgement here didn't implicate a profit-generating *res*. It merely identified a series of cash transfers from the fraudulent companies. Nor did it trace those funds into assets still in Hallam's possession. So it has not satisfied the requirements of either of the historically available equitable remedies identified by the parties.

The question whether the disgorgement order complies with *Liu*'s directions thus depends on whether the SEC needed to satisfy the requirements of a traditional equitable remedy—that is, on which reading of *Liu* is correct. But before this or any other circuit could authoritatively construe *Liu*, Congress amended the Exchange Act again. So the plot thickens.

### 3.

There are three relevant aspects to the amendments. Each applies to the same subsection of the Exchange Act—21(e) in the original Act,[64] which is codified at 15 U.S.C. § 78u(d).[65] That subsection is captioned "Injunction proceedings; authority of court to prohibit persons from serving as officers and directors; money penalties in civil actions; disgorgement."[66]

*First*, Congress expanded Section 78u(d)(3). That section was previously titled "Money penalties in civil actions" and concerned only the authority to impose the sort of penalties discussed *supra* Section II.A.[67] The

---

[63] 4 Pomeroy, *supra* note 40, § 1421, at 1081.

[64] Securities Exchange Act § 21(e).

[65] 2021 NDAA § 6501.

[66] 15 U.S.C. § 78u(d). The word "disgorgement" was added by the amendments.

[67] 2021 NDAA § 6501(a)(1)(A).

title now reads, "Civil money penalties and authority to seek disgorgement."[68] It confers jurisdiction on district courts to "require disgorgement . . . of any unjust enrichment by the person who received such unjust enrichment as a result of [an Exchange Act] violation."[69]

*Second*, Congress added Section 78u(d)(7), titled, "Disgorgement." It provides, "In any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may order, disgorgement."[70]

*Third*, Congress added Section 78u(d)(8). It establishes "[l]imitations periods" for certain remedies authorized by Section 78u(d).[71] It is relevant here because it distinguishes between "Disgorgement"[72] and "Equitable remedies."[73] "Disgorgement" is subject to either a five- or ten-year limitations period depending on the statutory provision violated,[74] while "any equitable remedy" must be sought within ten years.[75]

Congress also provided that those amendments "shall apply with respect to any action or proceeding that is pending on . . . the date of enactment of [the 2021 NDAA]."[76] Since the amendment "makes clear that it is

---

[68] *Id.*

[69] 2021 NDAA § 6501(a)(1)(B)(ii); 15 U.S.C. § 78u(d)(3)(A)(ii).

[70] 2021 NDAA § 6501(a)(3); 15 U.S.C. § 78u(d)(7).

[71] 2021 NDAA § 6501(a)(3); 15 U.S.C. § 78u(d)(8).

[72] 15 U.S.C. § 78u(d)(8)(A).

[73] *Id.* § 78u(d)(8)(B).

[74] *Id.* § 78u(d)(8)(A).

[75] *Id.* § 78u(d)(8)(B).

[76] 2021 NDAA § 6501(b). That provision of the bill appears to have been designated for codification as a statutory note rather than a freestanding section. *See id.* We attach no significance to that fact. "[W]hether . . . a provision is . . . set out as a section or

retroactive, [we] must apply [it] in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 226 (1995).[77]

4.

Other circuits have yet to grapple with those amendments. Two circuits have recently reassessed their disgorgement jurisprudence, but neither relied on the amendments, and neither elected to publish its opinion.

The Second Circuit, in a summary order, reaffirmed that a district court's authority to order disgorgement is rooted in Section 78u(d)(5)'s "any equitable relief" language. *SEC v. de Maison*, No. 21-620, 2021 WL 5936385, at *1–2 (2d Cir. Dec. 16, 2021) (unpublished). It concluded that *Liu* left its prior "reasonable approximation of profits" test undisturbed. *Id.* at *2 (quotation omitted). It rejected the defendant's contention that *Liu* requires tracing, *id.*, which at least hints that the court adopted the first reading of *Liu*.

The Tenth Circuit did essentially the same thing. It also concluded that its "reasonable approximation of profits" test for calculating disgorgement would continue to apply after *Liu*, rejecting the defendant's call for a strict tracing requirement. *Camarco*, 2021 WL 5985058, at *13–17 (quotation omitted). That holding appeared to rest on the first possible reading of *Liu*.

---

a statutory note[ ] does not in any way affect the provision's meaning or validity." Office of the Law Revision Counsel, *About Classification of Laws to the United States Code*, https://uscode.house.gov/about_classification.xhtml. That classification decision is merely "editorial." *Id.* The retroactivity provision has the force of law because it was contained in the statute passed by Congress and signed by the President. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993).

[77] *See also United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801) ("[I]f subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied.").

*Id.* at \*16 ("*Liu* acknowledged the availability of disgorgement as *an* equitable remedy . . . .") (emphasis added).  It also continued to ground disgorgement in Section 78u(d)(5).  *Id.* at \*13.[78]  But curiously, the court added that the second reading of *Liu* "may well prevail one day"; it merely declined "to stand alone on this matter." *Id* at \*16.

Judge Bacharach dissented in *Camarco*.  He would have adopted the second reading of *Liu*; he thought the appropriate post-*Liu* question was "[I]s the requested remedy one that was typically available in equity?"  *Id.* at \*22 (citing *Mertens*, 508 U.S. at 256).  He concluded that an equitable accounting could not apply to the case before the court for the same reason we stated above.  *Id.* at \*23.  So he would have applied a tracing requirement as in the case of a constructive trust.  *Id.* at \*21–22.  And he reasoned that the 2021 Exchange Act amendments merely confirmed *Liu*'s reading of Section 78u(d)(5). *See id.* at \*25.

The *Camarco* majority did not offer a contrary view of the amendments.  Instead, it explained that it was "limit[ing its] analysis to the contours of equitable disgorgement" and "leaving for another day whether the amended version of § 78u permits for disgorgement as a statutory-based remedy in law."  *Id.* at \*2 n.3.  So far, *Liu* appears to have changed very little circuit caselaw, and the amendments have changed even less.

### B.

#### 1.

Hallam reads *Liu* differently from the Second and Tenth Circuits' analysis.    According to him, *Liu* "banished" prior caselaw regarding

---

[78] That's at least partially attributable to the fact that the SEC had specifically pleaded a request for "equitable disgorgement" in *Camarco*. *Id.* at \*2 n.3.  Hallam agreed only that the district court could "order disgorgement."

disgorgement. He favors the second reading of *Liu*, which would require each individual "disgorgement" order to satisfy the elements of an historically available equitable remedy.

Hallam's reading of the statutory amendment is less forceful. At oral argument, his counsel claimed that the new statutory provisions are "not . . . of concern to this court."[79] He suggested that it would be inappropriate to rely on those amendments as the basis for affirming the disgorgement award because they were not considered by the district court.[80] And he contended that the amendments aren't retroactively applicable because the basis for ordering disgorgement is the consent agreement, which Hallam entered into before the amendments were enacted.[81] He conceded, though, that the amendments are "not a codification of *Liu*."[82]

The SEC disagrees about the meanings of both *Liu* and the amendments. It advances the first reading of *Liu*, which would mean that disgorgement has no limitations beyond those identified by the Court. It rebuts Hallam's contention that *Liu* "nullified fifty years of disgorgement precedent" by pointing out that *Liu* had only "occasional" criticisms of the lower courts' disgorgement awards.

To hear the SEC tell it, the statutory amendments may mean nothing at all. Its counsel informed the court that Congress didn't "change the nature of the relief that's available"; it merely "codifie[d]" *Liu*.[83] Its position is that even if the amendments change anything, those changes relate to aspects of

---

[79] Oral Argument at 2:17–2:22.

[80] *Id.* at 2:22–2:57.

[81] *Id.* at 3:28–5:05.

[82] *Id.* at 2:57–3:05.

[83] Oral Argument at 19:38–20:06.

No. 21-10222

disgorgement awards that aren't relevant here.[84]

2.

Neither party's interpretation of the amendments is persuasive. For starters, we reject the suggestion that the amendments merely codify *Liu*. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (quotation omitted). And "we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019) (quotation omitted).

The "codification-of-*Liu*" reading of the amendments would violate both principles. It would mean that Congress added two paragraphs to Section 78u(d) and changed a third without altering the requirements for the remedy that was the subject of all three revisions. And it would render nearly each new word redundant with the unaltered Section 78u(d)(5)—which had just been held to permit relief going by the same name as the name assigned to the newly added to the statutory language. That reading is unsupportable.

We also disagree that Congress's recent word on the subject is irrelevant to our decision. As we have explained, we are bound to apply an explicitly retroactive change in the law that is effected before we render judgment. *Plaut*, 514 U.S. at 226. It doesn't matter that Hallam agreed to the "disgorgement" before the statute was amended. That agreement included no further content to give meaning to that remedy's scope. So its amount was always going to be determined by reference to extracontractual legal principles.

---

[84] *Id.* at 21:01–21:56. For instance, it may vitiate the requirement that the award be "for the benefit of investors." *Id.*; *see also* 15 U.S.C. § 78u(d)(5); *Liu*, 140 S. Ct. at 1947–49. Neither party has raised that contention, so we have no occasion to consider it.

No. 21-10222

Hallam did not complain when *Liu* appeared to impose new constraints on the scope of that remedy. Instead, he made those purportedly novel limitations the cornerstone of his legal strategy. He may not now complain about Congress's decision to nullify those constraints—if they ever existed.

Nor do we think the amendments should necessarily be addressed first by the district court. True, we often emphasize the "general rule . . . that we are a court of review, not of first view."[85] But we need not remand where the district court's judgment, issued before the congressional action, turns out to be vindicated. *First Gibraltar Bank, FSB v. Morales*, 42 F.3d 895 (5th Cir. 1995).[86] The district court set forth a detailed rationale for awarding dis-

---

[85] *Texas v. Biden*, 20 F.4th 928, 965 (5th Cir. 2021) (quotation omitted), *cert. granted*, 142 S. Ct. 1098 (2022).

[86] In *First Gibraltar*, we affirmed a judgment based on a statutory amendment enacted after our initial disposition of the appeal. The district court granted summary judgment for the defendants, concluding that challenged state regulations had not been preempted by federal law. We first reversed after concluding that federal agencies had preempted state law by promulgating regulations. *First Gibraltar*, 42 F.3d at 896. Then, before our mandate issued, Congress amended the relevant statute to make clear that it couldn't be the basis for preempting state law. *Id*. at 897. We revisited the matter, noting our obligation to review the judgment under "the law as it currently exists." *Id*. at 898. After concluding that the amendment "restrict[ed] the congressional delegation of authority" to agencies to preempt state law, *id*. at 900, we concluded that the challenged regulations hadn't been preempted. So we affirmed the original judgment, *id*. at 902, even though we did so based on an amendment that didn't exist when the district court reached its decision.

This case is like *First Gibraltar*—it is not a situation in which the change in law presents the risk that the original judgment may "operate to deny litigants substantial justice." *Concerned Citizens of Vicksburg v. Sills*, 567 F.2d 646, 650 (5th Cir. 1978) (quotation omitted). "In such cases, where circumstances have changed between the ruling below and the decision on appeal, the preferred procedure is to remand to give the district court an opportunity to pass on the changed circumstances." *Id*. at 649–50.

Here, as we will explain, the statutory amendments reaffirm the legal framework in place when Hallam and the SEC reached the original consent agreement. So there is no risk of denying either litigant substantial justice in applying the amendment to the

No. 21-10222

gorgement under the pre-*Liu* legal framework.  The question posed by *Liu* and the amendments is purely legal:  whether that framework still applies or has been displaced.  We are well-positioned to consider how the answer to that question applies to this case.

3.

As amended, Section 78u(d) authorizes disgorgement in a legal—not equitable—sense.  In doing so, it ratifies the pre-*Liu* disgorgement framework used by every circuit court of appeals.

At oral argument, Hallam's counsel stressed the difficulty in making sense of the now-statutory term "disgorgement."[87]  He's right that generic definitions of "disgorge" are often unilluminating.[88]  But that isn't universally true; there is some evidence that the term had a public meaning resembling its eventual use in securities law, even before the Second Circuit used it in *Manor Nursing*.[89]  In any event, the historical pedigree of disgorgement as

---

judgment.

[87] Oral Argument at 3:06–3:20 ("The [NDAA] amendments are . . . blunt instruments.  It's still not clear what [they] mean.  For example, [they] just use[ ] the word 'disgorgement.'  What does that mean?").

[88] For instance, most dictionary definitions—both those published around the time of the amendments and those published around the time courts started using the term in securities law—describe disgorgement as the act of emptying something.  *E.g.*, Webster's New Collegiate Dictionary 327 (1977) (defining "disgorge" as "to discharge contents[, for example, ]where the river [disgorges] into the sea[ ]").  *See also, e.g.*, 1 Edward Gibbon, The Decline and Fall of the Roman Empire 104 (1776) ("The dens of the amphitheatre disgorged at once a hundred lions . . . .").  As Justice Thomas observed in his *Liu* dissent, 140 S. Ct. at 1951–53, the term was infrequently used in law or equity before the 1960s.  Black's Law Dictionary did not define the term until 1999.  *Disgorgement*, Black's Law Dictionary 480 (7th ed. 1999) ("The act of giving up something (such as profits illegally obtained) on demand or by legal compulsion.").

[89] That is, some definitions emphasize a figurative use of the term "disgorge" that "especially" refers to the return of ill-gotten gains.  The year before *Manor Nursing*, one dictionary defined "disgorge" as "to discharge the contents of . . . [especially] to give up

No. 21-10222

a remedy or a legal term has only ancillary relevance because we face a question different from the one in *Liu*. Our task is to understand what the amendments meant to a reasonable reader at the time they were enacted.

Three principles of statutory interpretation shape that inquiry. *First*, we consider "disgorgement" as a "legal term of art," not in its ordinary sense, because it is an undefined statutory term that had an established legal meaning by 2021. *FAA v. Cooper*, 566 U.S. 284, 291–92 (2012); *see also Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014). *Second*, we consider the whole Section 78u(d) as amended, not just the text of the amendments. *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019). *Third*, we "assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Ryan v. Valencia Gonzales*, 568 U.S. 57, 66 (2013) (quotation omitted).

That first principle establishes that Congress ratified either *Liu* or the pre-*Liu* circuit practice. "When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018)). That "old soil" includes a remedy's threshold requirements and auxiliary enforcement doctrines. *Id.* Whatever "disgorgement" meant—or didn't mean—at the merger of law and equity or in 1971, it was an established legal term with plenty of "soil" by 2021. All twelve regional circuits had long

---

illicit or ill-gotten gains." WEBSTER'S THIRD NEW INT'L DICTIONARY 649 (1971). And by 1989—and still in 2022—the Oxford English Dictionary defined "disgorge" as "[t]o discharge as if from a mouth; to empty forth; [especially] to give up what has been wrongfully appropriated." 4 OXFORD ENGLISH DICTIONARY 772 (2d ed. 1989); *id.* (Mar. 2022 update), https://www.oed.com/view/Entry/54376. *See also, e.g.*, 4 ARTHUR WELLESLEY, THE DISPATCHES OF FIELD MARSHALL THE DUKE OF WELLINGTON 121 (John Gurwood ed., rev. ed. 1837) (planning to negotiate "some mode to be devised to make the French Generals disgorge the church plate which they have stolen").

since maintained that a remedy by that name was available under the Exchange Act.[90]  And the Court had very recently recognized that a remedy or category of remedies under that label was consistent with "longstanding principles of equity."  *Liu*, 140 S. Ct. at 1947.  The question is:  From which pot did Congress transplant the term into the Exchange Act?

The second and third principles we introduced above demonstrate that Congress used the term "disgorgement" to authorize the sorts of disgorgement awards courts were ordering before *Liu*.

Our mandate is to give effect to "every word and every provision" of Section 78u(d).[91]  And it cannot be overlooked that the statute now distinguishes itself from *Liu*'s foundations in two critical ways.  For one thing, it explicitly authorizes "disgorgement" in Section 78u(d)(7), while *Liu* found that authority already present in the "equitable relief" allowed by the (unchanged) Section 78u(d)(5).[92]  If the amendments merely ratify *Liu*, one of those sections is "superfluous."  *Harrison*, 139 S. Ct. at 1058.  But more importantly, the whole act also demonstrates that the sort of "disgorgement" authorized by the amendments cannot be an equitable remedy, which clashes with *Liu* from the get-go.  *See Liu*, 140 S. Ct. at 1940 ("[A] disgorgement award . . . is equitable relief . . . .").

Section 78u's text now twice distinguishes between disgorgement and equitable remedies.  It does so first in paragraphs (d)(5) and (d)(7).  The former is captioned "Equitable relief" and authorizes "*any* equitable relief that

---

[90] *Supra* note 32 and accompanying text.

[91] *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012)).

[92] *See* 15 U.S.C. § 78u(d)(5); *id.* § 78u(d)(7); *Liu*, 140 S. Ct. at 1940.

may be appropriate or necessary for the benefit of investors."[93]  The latter is captioned "Disgorgement" and authorizes a remedy by the same name.[94]  Then again, in paragraph (d)(8), the same textual distinction is made when the statute specifies limitations periods.[95]  The obvious implication is that "disgorgement" is not "equitable relief."

Still, there is a potentially countervailing textual implication.  Paragraph (d)(3), which gives district courts jurisdiction to order disgorgement, explains that the awards must consist "of any unjust enrichment."[96]  That phrasing is consistent with a remedy rooted in equity, given that "unjust enrichment" is another term of art—the basis for all restitution, which is often equitable.[97]  And it is consistent with *Liu*, which described equitable disgorgement as a "profit-based measure of unjust enrichment."  *Liu*, 140 S. Ct. at 1943 (quotation omitted).

But not *all* restitution is equitable.  Indeed, "[t]he earliest proceedings in common law courts were restitutionary in nature."[98]  One example of an extant restitutionary legal action is quasi-contract.[99]  And the "basis" for liability in a claim for quasi contract is "unjust enrichment."  *Schall v. Camors*,

---

[93] 15 U.S.C. § 78u(d)(5) (emphasis added).

[94] *Id.* § 78u(d)(7).

[95] *Compare id.* § 78u(d)(8)(A) ("disgorgement"), *with id.* § 78u(d)(8)(B) ("*any* equitable remedy" (emphasis added)).

[96] *Id.* § 78u(d)(3)(A) ("United States district court[s] . . . shall have jurisdiction to . . . require disgorgement under [15 U.S.C. § 78u(d)(7)] of any unjust enrichment by the person who received such unjust enrichment as a result of [an Exchange Act] violation.").

[97] *Supra* note 44 and accompanying text.

[98] Restatement (First) of Restitution 5 (Am. L. Inst. 1936).

[99] *Id.* at 5–9.  *See also id.* § 5 ("The appropriate proceeding in an action at law for the payment of money by way of restitution is . . . [,] in States retaining common law forms of action, an action of general assumpsit.").

251 U.S. 239, 254 (1920). Congress's decision to measure the "disgorge-ment" remedy by "unjust enrichment" is thus consistent with either a legal or an equitable remedy. So paragraph (d)(3) can't defeat the implications of paragraphs (d)(5), (d)(7), and (d)(8).

There is also a sense in which explicitly authorizing a remedy in a statute's text is inconsistent with that remedy's being rooted in equity. The historical role for equity was to occupy that space "not regulated by some express or written law."[100] As it is often said, "equity follows the law."[101] Any federal-court jurisdiction to order equitable remedies must be conferred by Congress.[102] But when Congress does that for non-injunctive equitable relief, it typically uses the generic term "equitable relief," *Knudson*, 534 U.S. at 217 & n.3, as it did in the 2002 Exchange Act amendments, 15 U.S.C. § 78u(d)(5), a term that imports with it the whole body of traditional equity jurisprudence, *Liu*, 140 S. Ct. at 1942, 1947. The decision to name one particular remedy (other than an injunction) further suggests that the remedy is not equitable.

That conclusion is bolstered by applying the third principle. If we presume that Congress was aware of *Liu*, its decision substantially to amend the statute six months later concerning the same subject is unlikely to be an imprimatur.[103] Such swift, expansive action is more consistent with a desire to

---

[100] 1 Joseph Story, Commentaries on Equity Jurisprudence 5 (1st ed. 1836).

[101] 27 Am. Jur. 2d *Equity* § 123 (1964). That "maxim is susceptible of various interpretations." *Id.* One interpretation is that equity is that which is unprovided for at law; it can either be "completely outside of the law" while "leav[ing] the law concerning the same subject-matter in full force and efficacy," or "directly opposed to the law which applies to the same subject-matter." 1 John Norton Pomeroy, Treatise on Equity Jurisprudence § 427, at 468 (1st ed. 1881).

[102] *See Rees v. City of Watertown*, 86 U.S. (19 Wall.) 107, 120–22 (1873).

[103] *See, e.g.*, *Fed. Republic of Ger. v. Philipp*, 141 S. Ct. 703, 711 (2021); *cf. City of*

No. 21-10222

curtail the Court's decision—that is, to permit the sort of disgorgement awards ordered before the Court reemphasized "the limitations upon its availability that equity typically imposes," *Liu*, 140 S. Ct. at 1947 (quoting *Knudson*, 534 U.S. at 211 n.1)).

So we conclude that Sections 78u(d)(3) and (d)(7) authorize legal "disgorgement" apart from the equitable "disgorgement" permitted by *Liu*. That answers the question which "soil," *Taggart*, 139 S. Ct. at 1801, came with the "term of art," *Cooper*, 566 U.S. at 292, that Congress used. We must therefore apply the burden-shifting framework that prevailed before *Liu*.

4.

To get legal disgorgement, the SEC has the burden reasonably to approximate the defendant's "unjust enrichment" attributable to the securities violation. 15 U.S.C. § 78u(d)(3); *Halek*, 537 F. App'x at 581; *First City Fin.*, 890 F.2d at 1232.[104] That amount may not include "income earned on ill-gotten profits," *Blatt*, 583 F.2d at 1335, but it may include interest, *id*. If the SEC carries that burden, the burden then shifts to the defendant. To rebut the SEC's evidence, the defendant must prove that the requested

---

*Boerne v. Flores*, 521 U.S. 507, 512 (1997).

[104] Although Congress inserted the language authorizing disgorgement into the codified Exchange Act, we use the phrase "securities violation" rather than "Exchange Act violation." That's because 15 U.S.C. § 78u(d)(7) permits disgorgement in actions brought "under any provision of the securities laws." Since this case concerns a defendant who admitted liability under the Exchange Act, we do not here decide whether the amendments permit disgorgement where no Exchange Act violation occurs. The text suggests as much, and we have previously assumed without comment that disgorgement applied to violations of the Securities Act even though the language that *Liu* held to permit disgorgement was located only in the codified Exchange Act. *See SEC v. Kahlon*, 873 F.3d 500, 508–09 (5th Cir. 2017) (per curiam). But Section 78u now arguably grants *jurisdiction* to "require disgorgement" only for violations of "*this chapter*"—i.e., the Exchange Act. *See* 15 U.S.C. § 78u(d)(3)(A) (emphasis added).

amount is "unreasonable," *Halek* 537 F. App'x at 581, for instance, by interrupting the causal chain identified by the SEC, *First City Fin.*, 890 F.2d at 1232. Since the calculation of the amount of unjust enrichment is a question of fact, we review a district court's order for abuse of discretion. *Halek*, 537 F. App'x at 581.

The district court concluded that the SEC had met its burden reasonably to approximate Hallam's net profits from the securities violations at $1,901,480. That figure, if accurate, represents the amount he was unjustly enriched because his net profit is the sum total of the "advantage" he gained from his illegal conduct.[105] And the amount is a facially reasonable estimate of his unjust enrichment because it precisely identifies specific transactions that enriched Hallam.[106] So the burden shifted to him to discredit that approximation.

Hallam has invested little energy in attempting to do so before this court, preferring instead to mount a wholesale attack on the foundations of the burden-shifting framework. He says, for example, that the SEC's approximation "does not comport with the pre-fusion law of equity." He adds that "salary-type distributions," such as those at issue here, are also "not recoverable in equity." Even if those statements are true, they are irrelevant because, as we have explained, the SEC is permitted to obtain *legal* disgorgement. The question before us is factual: Did the district court clearly err in concluding that $1,901,480 is a reasonable approximation of Hallam's net benefit from his violations? [107]

---

[105] Restatement (First) of Restitution § 1 cmt. b (Am. L. Inst. 1936).

[106] *Contra Seghers*, 404 F. App'x at 864 (holding that the SEC had failed to meet its reasonable-approximation burden where it "fail[ed] to explain adequately the source of funds" it sought to disgorge).

[107] Clear error is the standard for the factual component of abuse-of-discretion

No. 21-10222

Hallam makes three points that are responsive to that question. *First*, he points out that the SEC calculated that figure by adding up "disbursements" he received from the fraudulent entities. But those disbursements, he says, are not the right sort of "profit" because the "scheme was perpetrated" by the companies, not by him personally—and those disbursements are expenses, not profits, vis-à-vis the companies. *Second*, he maintains that the SEC did not "segregate the sources of these payments between 'legitimate' and 'illegitimate' business conduct." *Third*, he claims that "many of the payments were from unknown companies not connected to the allegations . . . , others were indemnification for attorney's fees or reimbursement of expenses, and many were paid not to Hallam but to undescribed other entities." The district court rejected each of those contentions.

Hallam's first objection is fundamentally misguided. Hallam is a proper subject for a disgorgement award because he is a "person who received . . . unjust enrichment as a result of [a securities] violation." 15 U.S.C. § 78u(d)(3)(A)(ii). His consent agreement prevents him from contesting *his* obligation to "pay disgorgement of ill-gotten gains." Any obligation owed by the fraudulent entities is separate and irrelevant.

In sum, as to Hallam, any money he received enriched him. The only remaining question is whether that enrichment was unjust in the sense that it was attributable to violations of the securities laws. That leads to his second and third objections.

Hallam tells this court that the energy companies he helped run weren't completely fraudulent. He points to evidence in the record purporting to show that those entities engaged in some "legitimate business activities" and truly owned "working interests in wells [that] were actually

review. *Volkswagen*, 545 F.3d at 310.

drilled." (Emphasis deleted.) That may be. And it's true that legitimate enrichment, unconnected to the violations, must be disregarded when calculating a disgorgement award. But that principle doesn't apply here.

Hallam—not merely the companies—violated the law by selling "working interest investments using misleading offering materials." So even if the companies were partially legitimate, that doesn't change the fact that *all* of the *securities* transactions during the relevant period were unlawful. The district court found that its calculation of Hallam's unjust enrichment was "the compensation Hallam received for his role *in the sale of these securities*." (Emphasis added.) Hallam's second point is no basis for holding that clearly erroneous.

It's also true that the payments must have been connected to the companies for which Hallam sold securities. But Hallam's attempt to disprove that connection was utterly conclusory. He provided the district court with a "table of entries [he thought were] in error," amounting to $1,712,573.26 of the $1,901,480 in disbursements identified by the SEC. He provided little detail and no proof for that assertion. For instance, a whopping $906,436.63 was labeled "[i]ncorrect" without further elaboration; $100,300 more was dismissed as "wrongfully attributed." The district court did not clearly err by rejecting those barebones contradictions.

The district court properly concluded that $1,901,480 is a reasonable approximation of Hallam's "wrongfully obtained net profits." So it was empowered to order legal disgorgement in that amount under Section 78u(d)(3)(A)(ii) and (7).

5.

Because we have concluded that the award was permissible as legal disgorgement, we do not consider whether it met the standards for equitable disgorgement under Section 78u(d)(5) and *Liu*. That is, we do not decide

which reading of *Liu* is correct—or whether equitable disgorgement has survived the 2021 Exchange Act amendments. This court likely will need to resolve those and related questions in future cases.

For instance, as we have explained, an award including income that a defendant earned on his unjust enrichment is not permissible as legal disgorgement. But some equitable profit-based remedies, such as a constructive trust, allow that sort of recovery. So if we are confronted with an appeal from a request for an award of that nature, we may need to decide whether it could be equitable disgorgement consistent with *Liu*'s constraining those awards to "net profits," 140 S. Ct. at 1947. And that may also require us to resolve Hallam's contention that the SEC is required strictly to trace the ill-gotten gains, and the profits on them, into assets still held by the defendant.[108]

Whether a securities defendant has a Seventh Amendment right to a jury trial to determine the amount of disgorgement is another potential difference between legal and equitable disgorgement that may require us conclusively to interpret *Liu*. The general rule is that the Seventh Amendment applies to "actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348 (1998).[109] Courts answer that question by "examin[ing] both the nature of the statutory action and the remedy sought." *Id.*[110] Because securities dis-

---

[108] The SEC's counsel conceded at oral argument that such an award of "profits on profits" would require tracing, even after *Liu*. Oral Argument at 22:56–24:14.

[109] *See Jarkesy v. SEC*, 34 F.4th 446, 451–59 (5th Cir. 2022) (holding that the Seventh Amendment jury-trial right applies to SEC actions seeking civil penalties for violations of securities-fraud statutes).

[110] *See also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 40–42 (1989); *Tull v.*

No. 21-10222

gorgements awards have previously been considered equitable, defendants have not been afforded a jury trial to determine the amounts. *SEC v. Commonwealth Chem. Sec.*, 574 F.2d 90, 94–96 (2d Cir. 1978).[111]  Our conclusion—that what we have called legal disgorgement is distinct from the equitable disgorgement recognized in *Liu*—may have altered that analysis.  But we lack jurisdiction to decide whether that changes the outcome because Hallam has not pressed a jury demand, having waived that right in his consent agreement.  So that question, too, must await another day.

Finally, as we have observed, no party has asked us to consider whether a legal disgorgement award must be "for the benefit of investors." *See Blackburn*, 15 F.4th at 681 n.4 (quoting 15 U.S.C. § 78u(d)(5)) (declining to decide the issue).  Accordingly, we do not decide that question either,[112] while noting that the 2021 amendments "specifically authoriz[e] disgorgement without [including that] language." *Id.*

\*          \*          \*

None of Hallam's challenges to the district court's remedies has merit.  He has foreclosed some of them by failing to raise them timely or to raise them properly.  And Congress has foreclosed his position on the availability of disgorgement without tracing or a profit-generating *res*.  The district court had authority to impose each element of its remedies, and it did not abuse its discretion in doing so.  The judgment ordering Hallam to pay $4,227,335.38 plus any postjudgment interest and to refrain from dealing in unregistered securities except in his own account is AFFIRMED.

---

*United States*, 481 U.S. 412, 417–18 (1987).

[111] *Accord Osborn v. Griffin*, 865 F.3d 417, 461 (6th Cir. 2017); *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993); *cf. Life Partners Holdings*, 854 F.3d at 781–82.

[112] *Supra* note 84.

No. 21-10222

ANDREW S. OLDHAM, *Circuit Judge*, concurring in part:

I join all but Part V of the majority opinion. As to that part, I understand the relevant questions presented differently. In a consent judgment, Parker Hallam agreed that the district court "shall order" and that he will "pay disgorgement of ill-gotten gains . . . in an amount to be determined by the Court upon motion by the Commission." He also agreed that he "may not challenge the validity of this Consent of the [Consent] Judgment." The district court then entered the consent judgment. After that, the Supreme Court decided *Liu v. SEC*, 140 S. Ct. 1936 (2020), and Congress amended 15 U.S.C. § 78u in the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4626 (2021) ("statutory amendment").

In my view, the questions presented are two: (1) What did Hallam agree to pay in the consent judgment? And (2) what effect, if any, did *Liu* and the statutory amendment have on that agreement? As to (1), I would hold that the district court did not clearly err in calculating Hallam's agreed-upon disgorgement as $1,901,480. And as to (2), Hallam argues that *Liu* and the statutory amendment prevent the district court from awarding a disgorgement remedy. Maybe that's right; maybe it's wrong. But either way, it seems difficult or impossible to reach that question in the face of a consent judgment entered before the law changed. The real question is whether *Liu* or the statutory amendment somehow prevented Hallam from consenting to more than what the applicable statutes arguably permitted. As to that question, Hallam makes no argument, and I see nothing in *Liu* or the statutory amendment to suggest that Hallam can't consent to the disgorgement awarded by the district court.